IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES A. BRENSON, JR.

         **CASE NO. 2:11-CV-1146**
  **Petitioner,**     **JUDGE EDMUND A. SARGUS, JR.**
          **Magistrate Judge Kemp**

v.

WARDEN, TOLEDO
CORRECTIONAL INSTITUTION,

  **Respondent.**

## REPORT AND RECOMMENDATION

   Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant *Petition* and *Corrected Memorandum Support* (Doc. Nos. 1, 4); Respondent's *Return of Writ and Supplemental Return of Writ* (Doc. Nos. 11, 28); Petitioner's *Reply, Supplement to the Reply* and *Supplemental Traverse* (Doc. Nos. 19, 24, 38); Respondent's *Sur Reply* (Doc. No. 43); and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Petitioner's request to strike Respondent's *Supplemental Return of Writ* be **DENIED** and that the habeas corpus petition be **DISMISSED.**

## I. FACTS AND PROCEDURAL HISTORY

   On June 11, 2000, Norman "Duck" Herrell was found murdered inside his home as a result of multiple stab wounds. Petitioner and co-defendant William T. Allen were charged by indictment with Herrell's murder on July 28, 2000; however, on January 16, 2001, the indictment was dismissed pending further investigation. Seven years and

three months later, on April 16, 2008, an indictment issued charging Petitioner and Allen as the perpetrators of the offense.  After a jury trial in the Delaware Court of Common Please, Petitioner was found guilty, as charged.

The Ohio Fifth District Court of Appeals set forth the following facts:

> Defendant-appellant, James Brenson, appeals his convictions for one count of aggravated murder, in violation of R.C. 2903.01(A), one count of aggravated murder, in violation of R.C. 2903.01(B), murder with repeat violent offender specification in violation of R.C. 2903.02(B), kidnapping with repeat violent offender specification in violation of R.C. 2905.01(A)(2), kidnapping with repeat violent offender specification in violation of R.C. 2905.01(A)(3), aggravated robbery with repeat violent offender specification in violation of R.C. 2911.01(A)(1), and one count of aggravated robbery with repeat violent offender specification in violation of R.C. 2911.01(A)(3). Plaintiff-appellee is the State of Ohio.

> STATEMENT OF THE FACTS AND CASE

> On June 11, 2000, at approximately 10:00 p.m., Norman "Duck" Herrell was at his home talking on the telephone with his ex-wife, Phyllis Gaskins. A knock on the door at Herrell's house interrupted the conversation. Herrell told Gaskins that he would call her back, but he never called.

> The next morning, Herrell did not report to work at his furniture store, J & D furniture. His son, Michael Herrell, became concerned, and tried repeatedly to call his father throughout the day. When he still could not reach Herrell by the afternoon, Michael went to Herrell's house to check on him.

> Michael testified at trial that when he arrived at Herrell's house, the door was unlocked and there were blankets hanging over the windows in the living room. Michael stated that his father was an immaculate housekeeper and that when he entered the home on June 12th, the house was a mess, it appeared to have been ransacked, and Herrell's

gun cabinet was open and his guns were missing. Michael found his father lying face down on the floor in a pool of blood in the basement. He called 911.

The arriving officers searched the house for additional victims or suspects. No one else was found to be in the residence. They also checked for, but did not find, evidence of a forced entry.

After determining that Herrell's death was a homicide, the Delaware Police Department contacted the Ohio Bureau of Criminal Investigation (B.C.I.) for assistance in processing the crime scene.

While processing the scene, officers recovered several pieces of evidence. They recovered two knives, including a small brown knife from the love seat in the basement, which appeared to have blood on it. After DNA tests were run on the knife, it was determined that, the blood present on the knife was that of Herrell.

Officers also recovered a pair of brown cloth gloves, which were saturated with blood. DNA recovered from those gloves matched both Herrell's DNA and subsequently that of Brenson's co-defendant William Allen. Additionally, authorities recovered a long-sleeved, blue shirt that later was determined to possess the DNA of Allen, as well as his wife, Silvy Allen FN1.

FN1. The record reflects that the Allens were married in 2005.

Officers also recovered a guest receipt from a Meijer store in Oregon, Ohio, which is near Toledo. They were able to determine that a person who identified himself as K.W. Yowpp made the purchase and a return on June 9, 2000 FN2. K.W. Yowpp is a known alias of Brenson. Brenson's fingerprint was retrieved from the receipt.

FN2. 15T. at 2233

Brenson's fingerprint was also recovered from an envelope at Herrell's house containing a dog tag.

While searching Herrell's home, authorities observed that many items in the house had been disturbed, including pictures taken off walls, chairs moved from the kitchen to rooms that had blankets over the windows, rooms that had been ransacked, as if the intruder(s) were looking for something. They also observed a large quantity of illegal fireworks in the basement of the house.

Several days following the initial search of Herrell's house, authorities returned to the house after learning that Herrell had a safe hidden in the house. Herrell's family had not disclosed to the authorities that the safe existed, but after authorities asked about the safe, Herrell's daughter, who was the only person besides Herrell with the combination to the safe, opened it for them. Contained within the safe were silver coins, old stopwatches, a deed to rental property owned by Herrell, and some jewelry.

Franklin County Deputy Coroner, Dorothy Dean, testified that Herrell had been stabbed fifty-one times. Three of the stab wounds were potentially fatal.

During the investigation of Herrell's murder, officers discovered that Herrell and Brenson spent several months in prison together at Marion Correctional Institution in 1981. Herrell's children were also familiar with Brenson, having seen him with Herrell before. Herrell's children identified Brenson as "Muhammad."

Sometime in 2001, officers learned that Ohio Highway Patrol Trooper Brandon Spaulding stopped Brenson during the evening hours of June 11, 2000, on U.S. 23 South in the area of Bucyrus, Ohio. Trooper Spaulding testified at trial that he was running license plates on vehicles at a rest area, when he ran the license plate on Brenson's red Ford F–150 at approximately 8:51 p.m. The truck was registered to Mustafa Muhammad, which is Brenson's son. At that time, Trooper Spaulding believed that the license plate on the truck actually belonged on a different vehicle. The trooper pulled his cruiser up behind Brenson's vehicle and got out of his cruiser to approach Brenson. Upon approaching Brenson, Trooper Spaulding noted that Brenson was sitting in the vehicle alone.

Trooper Spaulding determined that he had conveyed one of the letters on the license plate incorrectly to the dispatcher, and started to explain the mistake to Brenson. Brenson became angry and began swearing at the trooper, claiming that the trooper was harassing him because of his race. Trooper Spaulding noticed that Brenson's front license plate was in the dashboard. He warned Brenson to attach the license plate to the front of the vehicle. Eight minutes after he initiated the stop, Trooper Spaulding cleared the call and left the rest stop.

According to Brenson FN3, he then went to the next exit to obtain materials to attach the license plate to the front of the truck. Brenson testified in 2002 and 2008 before the Delaware County grand jury that he was on his way to Delaware, Ohio, to purchase fireworks from Herrell. He also stated in his 2008 grand jury testimony that he purchased zip ties to secure the license plate to the front of the truck FN4.

FN3. Brenson did not testify at trial. He did, however, testify twice before the Delaware County Grand Jury. He first testified on April 18, 2002. He testified a second time on April 15, 2008. Additionally, he agreed to meet with police detectives for an interview on January 14, 2003. It is from a combination of these three occasions that the prosecution introduced various statements made by Defendant Brenson at trial.

FN4. The prosecution attempted to demonstrate that a search of Brenson's vehicle in October 1999 yielded similar plastic zip ties in order to show that he did not purchase the plastic ties because of the June 11, 2000 traffic encounter with Trooper Spaulding. (12T. at 1390; 1395).

In March 2001, the police recovered Brenson's truck, and found no blood in the truck. They did find that his front license plate was attached to the front of the truck with a coat hanger.FN5

FN5. See note four, supra.

At trial, Phyllis Gaskins testified that when she was speaking on the phone with Herrell on the night of June 11, 2000, he

-5-

told her that two "white guys" were at the door. She later retracted her statement, claiming that Herrell would not have called the men "white guys." Brenson later told authorities that he saw a van with "two white guys" come up to Herrell's house as he was leaving. He claimed they were in a white van with Cuyahoga County license plates on it.

Brenson told the grand jury that he left Herrell's house that night and returned to Toledo, arriving home around 11:00 or 12:00 that night FN6.

FN6. Brenson did not testify at trial. He did, however, testify twice before the Delaware County Grand Jury. He first testified on April 18, 2002. He testified a second time on April 15, 2008. Additionally, he agreed to meet with police detectives for an interview on January 14, 2003. It is from a combination of these three occasions that the prosecution introduced various statements made by Defendant Brenson at trial.

Brenson also testified before the grand jury that he and Allen had been friends since 1979, that they both lived in Toledo, and that they had taken numerous trips together over the years. At trial, the prosecution called numerous friends and family members of Brenson to testify that they had seen Brenson with Allen multiple times throughout the years.

In October 2005, Allen became linked to Brenson through an informant. Allen reported being the victim of a felonious assault. As a result, the police obtained a blood sample from Allen. Subsequently, police were able to link Allen's DNA to the shirt found in Herrell's kitchen. Allen was also found to have a 1–in–30 chance of being a contributor to the DNA found on the blood soaked cloth gloves in Herrell's kitchen.

Prior to being informed that his DNA was found at the scene of a crime, during an interview with the police in 2005 when he was the victim of a felonious assault, Allen informed the police that he was good friends with Brenson, whom he identified as "Muhammad." When the police showed Allen a photograph of Herrell, his demeanor changed and he looked at the picture and stated that he did not know him.

> A car dealer in Toledo testified at trial that in April 2000,
> Allen purchased a car for $600 and then sold it back in July
> 2000 for $200. Shanica Masadeh, Silvy Allen's daughter,
> testified at trial that Silvy and Allen suddenly moved to
> Florida in July 2000, and that Silvy gave custody of her to
> Silvy's grandmother because Silvy could not support her.
> The police obtained records from Florida that Allen and
> Silvy both worked for a temporary agency from August 8,
> 2000, to December 20, 2000.
>
> Brenson's first defense attorney, Thomas Beal, testified at
> trial that he had a conversation with the Delaware County
> Prosecutor on December 3, 2000, that the indictment against
> Brenson would be dismissed, most likely by December 15,
> 2000. Allen then returned to Ohio in late December, 2000.
>
> ***
>
> Following their convictions, both defendants were sentenced
> to an aggregate of thirty years to life in prison.

*State v. Brenson*, ("*Brenson I*") No. 09-CA-18, 2010 WL 3784890, at *1-4 (Ohio App.

5th Dist. Sept. 28, 2010).

Petitioner filed a timely appeal. *Exhibit 37 to Return of Writ.* He asserted that he

had been denied his right to a speedy trial; denied a fair trial due to the eight-year delay

in bringing charges; denied the right to counsel in regard to his 2008 testimony to the

grand jury; denied due process because the prosecutor failed to advise him, prior to his

testimony before the grand jury that charges had been filed against him; denied the

right to an impartial jury because the trial court refused to dismiss jurors exposed to

pre-trial publicity; denied his right to a fair trial because the trial court twice refused to

grant a mistrial; denied a fair trial in view of testimony from his prior attorney; denied a

fair trial due to admission of his grand jury testimony; denied effective assistance of

counsel; denied a fair trial based on cumulative error; that his convictions were against the manifest weight of the evidence; and that his convictions should have been merged into one count of aggravated murder and kidnapping or aggravated robbery. *See Petition; Reply to Supplemental Return of Writ,* Doc Nos. 1, 38.

On September 28, 2010, the appellate court sustained Petitioner's claim that his convictions on aggravated murder, aggravated robbery and kidnapping should have been merged and remanded the case to the trial court for re-sentencing, but otherwise affirmed the judgment of the trial court. *Brenson I* at *57.[1] On November 3, 2010, the

---

[1] Judge Delaney issued the following dissenting opinion:

> I respectfully dissent from the majority opinion. I would sustain Appellant's third, tenth and twelfth assignments of error for the reasons set forth herein and in my dissenting opinion in *State v. Allen,* 5th Dist. No. 09–CA–13, ––– Ohio ––––. The majority holds today that Appellant has not shown prejudice sufficient to amount to cumulative error requiring a reversal and a new trial. In so doing, the majority summarily dismisses the numerous errors that pervaded the jury proceedings, prohibiting Appellant from receiving a fair trial that justice requires.

> The cumulative error doctrine requires a conviction to be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623, 637.

> In the present case, I find that there have been multiple instances of harmless error triggering the cumulative error doctrine. First, the majority summarily dismisses as nonprejudicial and cumulative that Appellant used multiple aliases other than K.W. Yowpp. Evidence was admitted that Appellant used the additional aliases of M.A. Muhammad, Muhammad Mustafa FN16, Jonquail Kirkland, and Robin Shabazz. Admission of these aliases had nothing to do with Appellant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake regarding the charges in the instant case. Rather, they were used to show Brenson's bad character.FN17 Evidence introduced of use of an alias where the alias is not an integral part of the commission of the crime is a violation of Evid. R. 404. See *State v. Petty* (May 21, 1987), 8th Dist. No. 52069.FN18

> FN16. The evidence that Appellant used his son's name to check into the hospital is in no way relevant to the guilt or innocence of Appellant or Allen, nor does it show consciousness of guilt as the majority now suggests. See majority opinion, ¶ 322. This was not argued as "consciousness of guilt" at trial or on appeal. More conceivably, the prosecution introduced this evidence to taint Appellant's credibility and imply that he was attempting to not pay his hospital bill by giving faulty information to the hospital.
> FN17. References to Appellant's various aliases were discussed at the following pages in the

transcript: 554, 1055, 1326, 1347, 1361, 1362, 1365, 1389, 1822, 1834, 1857–1858, 1971, 1972, 1977–1979, 1980, 1981, 1984, 2033, 2062, 2212, 2361, 2364, 2366, 2370, 2371, 2373, 2375, 2379, 2382, 2383, 2409, 2416, 2526, 2555; references were also found in the Grand Jury transcript sent back to the jury at pages 17 and 46–47.

FN18. The majority also mentions that indictment listed out various aliases of Brenson. See majority opinion, ¶ 319. An indictment serves only to put a defendant on notice of the crimes with which he is charged. Crim. R. 7(B). It does not serve as a discovery mechanism, nor does it serve to put a defendant on notice that the State would seek to improperly introduce evidence of multiple aliases at trial.

\The majority summarily dismisses the prejudice from the admission of evidence that Brenson used multiple social security numbers. Again, admission of such evidence is not relevant to either the prosecution of Appellant or Allen. The admission of these social security numbers had nothing to do with Appellant motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake with regard to the charges in the instant case.FN19 The majority fails to adequately explain how these aliases, social security numbers, and references to Appellant's illegitimate children were relevant; rather the majority sidesteps the issue that such character evidence was not only inadmissible, but was also highly prejudicial against both defendants.

FN19. References to various social security numbers used by Brenson can be found at the following pages in the transcript: 1152, 1972, 1976–1977, 1977–1979, 2383, 2422, and 2526.

The majority also rejects the prejudice created by the admission of evidence that Appellant was having an affair with one woman while married to another. Such evidence is highly inflammatory as it relates to Appellant and certainly has no bearing on Appellant's guilt. This is evidence admitted solely to tarnish the reputation of the accused. Moreover, evidence that Appellant had extramarital affairs and that he fathered multiple children with different women is both irrelevant and highly inflammatory.FN20 Again, there is no good faith basis for the admission of such evidence against either codefendant. The prosecutor argued that such information was relevant as it went to "financial situation and motive." FN21 The prosecution then proceeded to ask questions to Brenson's ex-wife, Robin Shabazz, such as "Do you know if they [Brenson's children with Lalitre] were born in the course of your marriage?" to which Shabazz responded, "yes." The prosecution asked, "What about Minimah?" and Shabazz responded, "yes." The prosecutor then asked Shabazz, regarding Brenson's children with other women, "I'm up to ten. Do you know how many children he had in total?" to which Shabazz replied, "eleven." The prosecutor, not satisfied with having Shabazz merely state the answer repeated, "He has eleven children?" (Tr. 2380–2381).

FN20. References during trial to Brenson's illegitimate children and his extramarital affairs can be found at the following pages in the transcript: 508, 1836–1837,1854, 1975, 1976–1977, 1977–1979, 1991, 1995, 2023, 2075, 2086, 2216, 2231, 2249, 2348, 2370, 2379, 2380, 2381, 2390, 2391, 2392; references were also found in the Grand Jury transcript sent back to the jury at page 17, lines 1–13, page 20, and pages 23–24.

FN21. There was never argument by the prosecution, either at trial or before this Court, that such evidence was elicited during the cross-examination of Shabazz to impeach or show her bias as the majority now suggests. See majority opinion, ¶¶ 334–336. In fact the State concedes in its brief that it sought to introduce "motive for the State's theory of the murder * * * [e]vidence that Appellant had many children and the financial stresses that accompany

many children, was extremely relevent to provide a motive for the crime." Appellee's Brief, p. 30.

The prosecutor proceeded to ask Shabazz about Brenson's whereabouts during the years of 1995 to 1999 and whether she was aware that he was living with a girlfriend, LaLitre, in Florida during that time. (Tr. 2390). Then the prosecutor immediately turned to asking Shabazz if she knew Holly Lewis. Shabazz responded "I think she used to work for a radio station doing advertising." The prosecutor then responded, "Did your husband ever tell you that he and Holly had a long term relationship and he drove down to Columbus about five times a year over a five year period to see her?" (Tr. 2392). I cannot comprehend, nor can the majority defend, the relevance of this testimony as it relates to the witness's bias in favor of Brenson.

Though the prosecutor claimed that this information was essential to establish Brenson's motive (Tr. 2379), during their closing arguments, they did not one time mention that such a motive existed. The majority has reconstructed the State's argument to one of bias, which still fails to adequately defend the admission of such testimony. In fact, the prosecution made clear to ask the court to instruct the jury that "they may find the defendants guilty without knowing their motive, if they find every element proven beyond a reasonable doubt and the state went between that purpose, which I think was somewhat confusing during Mr. McVay's closing." (Tr. 2557). The prosecution also stated, during rebuttal closing, that "I want to be clear about this issue of motive also because Mr. McVay, I think, muddied the waters on that. Motive, ladies and gentlemen, in this case and I think it's fairly clear, is robbery. Whoever did this wanted to steal drugs or money or both and guns and fireworks." (Tr. 2516). Attorney McVay's comment that the prosecutor was referring to was that after listening to nine days of testimony, "only today was it suggested that there was any reason whatsoever why James Brenson would kill Norman Duck Herrell." (Tr. 2467), in reference to the cross examination of Robin Shabazz, who testified that day.

All in all, the references to Brenson's multiple aliases, use of different social security numbers, and his illegitimate children and extramarital affairs totaled sixty-nine.

Initially, I find the admission of character evidence, specifically that of Appellant's previous personal relationships with women and the children produced as a result of those various relationships, to have been allowed in error. The admission of evidence that Appellant was having an affair with one woman while married to another was highly prejudicial and inflammatory as it relates to both Appellant and Allen and certainly has no bearing on Appellant's or Allen's guilt. This is evidence admitted solely to tarnish the reputation of the accused. Moreover, evidence that Appellant fathered multiple children with different women is both irrelevant and highly inflammatory. Again, there is no good faith basis for the admission of such evidence against either codefendant. This evidence, by itself, could be considered harmless, but when coupled with the additional errors at trial, loses its harmless nature.

Moreover, the multiple motions for mistrial provide a basis for an analysis of the harmless errors that were committed in this trial. As the majority has noted, the grant or denial of an order of mistrial lies within the sound discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900; *State v. Widner* (1981), 68 Ohio St.2d 188, 190, 22 O.O.3d 430, 431, 429 N.E.2d 1065, 1066–1067. A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge. See *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100, quoting *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d

-10-

1237, 1246. However, mistrials need be to declared when the ends of justice so require and a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9.

For instance, the testimony initially admitted regarding the October, 1999, search of Appellant's vehicle, which resulted in the seizure of a shotgun, shotgun shells, masks, knives, a D.E.A. hat, rubber gloves, and zip ties formed the basis for one of these "harmless" errors. This search took place almost a year preceding the murder of Herrell and was only marginally relevant to Appellant's case. Appellant made a motion for mistrial after the introduction of this evidence. The trial court denied the motion and then trial counsel requested that Lieutenant Gorney's entire testimony be struck from the record as being violative of their clients' right to a fair trial.

The court granted the motion to strike the testimony of Lieutenant Gorney, finding that "had the pictures of the gloves, duct tape, plastic ties being separated out ... that would have been permitted under the 404(B) exception on identification. Unfortunately, it was all thrown in together by pictures with testimony with evidence excluded by 404(A) and, therefore, that was the reason that was excluded under 404."

If this error were isolated, I would find that the trial court's curative instruction and the striking of Lieutenant Gorney's testimony following the eliciting of the inadmissible evidence was sufficiently curative and no mistrial was warranted. While the prosecution sought to properly admit evidence found in Appellant's car, i.e., the zip ties, knives, and gloves, they also admitted other irrelevant items found in the car. Those items included the D.E.A. hat, a shotgun, and ski mask among other things. The court, after hearing Lieutenant Gorney's testimony, determined that the prejudicial nature of the admission of such evidence far outweighed the probative value of such evidence. At that time, the court decided to strike the whole of Lieutenant Gorney's testimony. In so doing, the court instructed the jury as follows:

 "Folks, we heard testimony this morning from Lieutenant Gorney from the Toledo Police Department and at this point in time, I instruct you all to disregard his testimony in full, completely, strike it from your memory, treat it as though you never heard it."

The trial court did not abuse its discretion in failing to order a mistrial on these grounds. Cf. *State v. Glenn* (1986), 28 Ohio St.3d 451, 455, 28 OBR 501, 504, 504 N.E.2d 701, 706; see *State v. Warren* (1990), 67 Ohio App.3d 789, 799, 588 N.E.2d 905, 912. While the admission of the evidence was error, I would find that error, by itself, would be harmless in light of the curative instructions given by the trial court. Taken with the other errors at trial, though, this error does not remain in the realm of harmless.

Additionally, the parading of Allen's wife in front of the jury was error, albeit error that by itself may have been harmless.

Appellant argues that the trial court should have granted a mistrial after the prosecutor called Allen's wife to the stand. These facts were discussed in the majority opinion, but bear reiterating for purposes of this analysis. Specifically, the facts giving rise to the motion for mistrial were as follows: The State had failed to successfully serve Silvy Allen with a subpoena prior to trial. After the trial had commenced, the prosecutor served Mrs. Allen with a subpoena when she accompanied her daughter to the courthouse to testify. Even

though the prosecutor was able to serve Mrs. Allen with a subpoena at the courthouse, the prosecutors neglected to speak with her prior to calling her to the stand to determine if indeed she would cooperate and testify against her husband. Moreover, Mrs. Allen would have been in need of Miranda warnings and an attorney, as her DNA was found at the murder scene and she went to Florida with Appellant as well.

During trial, in front of the jury, the prosecutor proceeded to call Mrs. Allen to the stand to testify. After she took the stand, prosecution asked the court if counsel could approach. At a sidebar conference, the following exchange was held:

"[Prosecutor]: Your Honor, we are approaching prophylacticlly [sic], a thought had occurred that the witness might say at some point that she wished not to testify. Your honor, perhaps we should ask that question when the jury is not present. There is a privilege in this case although they weren't married until 2005, well after the murder, but anything we're asking her about was before they were married, not during covatures. [sic]"

"The Court: Well, I think we should probably address it before.

"[Prosecutor]: There's a competency issue that I don't want to come up in front of the jury.

"The Court: Okay. I'll excuse the jury and we can address it.* * *"

The following then occurred after the jury was dismissed from the courtroom and the witness was sworn:

"The Court: Be seated, folks.

"The Court: Do you want to inquire?

"[Prosecutor]: Your honor, my understanding of the case law in this area, I think it would be appropriate for the court to ask questions of the witness regarding Evidence Rule 601.

"The Court: Your name is Silvy Allen; is that right?

"A: Silvy Sparks Allen.

"Q: Silvy Sparks Allen?

"A: Right.

" * * *

"Q: And you're currently married to Mr. William T. Allen, who is one of the defendants in this case?

"A: That's correct.

"Q: And when were you married?

"A: I'm sorry. Under my stress I'm not going to be totally accurate. Maybe three years ago.

_____

"Q: This is 2008. So 2005 sometime?

"A: Yes.

"Q: And it's my understanding that you're electing to testify today; is that right?

"A: No. And I'm also going to plead the fifth because I wish not to testify against my husband. This subpoena was just given to me momentarily ago. I accompanied my daughter who was subpoenaed.

"Q: Okay. So you refuse to testify?

"A: That's correct.

"The Court: All right, what's your position on this, Mr. Rohrer?

"[Prosecutor]: Your Honor, the strictures of Evidence Rule 601, I think, are pretty clear. I don't know that there's much leeway in this. I guess the only argument I would make—having reviewed the case law, there's really no good faith argument I can make contrary to that, your honor. The competence issue applies at the time the witness is testifying, which is now and we have no reason to believe they're not married.

"The Court: All right. Any statements for the regard on behalf of Mr. Allen?

"Mr. Heald: No, your Honor.

"The Court: All right, ma'am. You can step down.

" * * *

"Mr. Meyers: * * * We would, in retrospect, lodge an objection to what just transpired here, whereby if the government was aware, as obviously they were, that this witness was going to exercise her right not to testify, they should have brought that to the court's attention before parading her onto the stand. I'm sure I wasn't the only one in the room who watched everybody carefully watching her and now, obviously, they've implied, improperly that for some reason, I suppose not of their own making, they've sent the signal by just her physical presence that she's refused to testify. It's inappropriate and we object and move for a mistrial. It's no different than calling a witness you know who is going to take the Fifth and playing that hand in front of the jury.

"Mr. Heald: Your Honor, we would join in the objection in that motion.

"The Court: Does the State want to respond to the objection and motion?

"[Prosecutor]: Your Honor, that's the exact reason I approached the bench before we asked the witness any questions, to address that issue because it popped up. We only served her with her subpoena about five minutes ago.

—————————————————

"Mr. Meyers: Clearly, the State must have heard something out in that hallway that caused them to approach the bench. Why they waited until after they had the little parade or charade is inappropriate.

"The Court: I was kind of curious about that myself.

"[Prosecutor]: Your Honor, Mr. Mooney was in the hallway and had a conversation with the witness prior to that, too, and it wasn't raised by anyone else in the room except myself before the witnesses testified.

"Mr. Meyers: We're certainly not privy to the conversations the government or its counsel or it's [sic] chief law enforcement agency has had with her. * * * We have known generally that they've been trying to serve Silvy Allen up in the Toledo area. If they've got a shot to protrusely [sic] drop an immediate subpoena on her and were apparently one or all total, all three together, state representative told by her, I'm not testifying, she most certainly has been paraded in front of this jury.

"[Prosecutor]: She didn't say that, your honor. She told us she was refusing to accept a subpoena. Until we found her person and got her served personally with the subpoena, we couldn't force it. But we found her, we served her with a subpoena and she was in court. I had no conversations with her, Miss O'Brien had no conversations with her, Sergeant Leatherman had no conversations with her today.

"Now, the look on her face lead [sic] me to believe that we should approach the bench before her answering any questions. I said something to her about our fair city, she said "I hate your fair city", or something to that effect. She did not tell me she did not want to testify."

The court, in ruling on the motion for mistrial, stated as follows:
"We have motions for mistrial pending on behalf of both defendants. I think it's the fourth motion for mistrial in this case, feeling that the substantial rights of their clients have been affected by the parading of Miss Allen in here in front of the jury. And then Miss Allen's refusal to testify. Certainly, I agree with counsel that a simple question by Mr. Rohrer, do you wish to testify or not, would have handled it and not brought her in, nor probably the calling of her name in the courtroom, that he was calling her as a witness. And I'm not sure that's akin to putting someone on the stand to plead the Fifth when the prosecutor knows that the witness was going to do that, although it comes pretty close. In this case, the jury was excused and outside the presence of the jury the witness said that she didn't want to testify.

"You know, frankly the court should have anticipated that except I found myself in the same position, wondering if she was coming in the courtroom, then she must be willing to testify. But it's something that is required to do if the spouse is going to testify, to bring them in in advance and say, do you wish to testify; you have a right not to testify. Has substantial prejudice been shown? No, nor has counsel really stated what the substantial prejudiced this would be [sic] except what inference the jury may or may not take from the fact that she was called in in front of them and then she did not testify. The court is going to give an instruction to the jury and the instruction would either be one that they are not to infer anything from the fact that Mr. Allen's wife refused to testify, or did not testify because our law says a spouse does not have to testify in a trial of her husband, if she so chooses, or the instruction would be that they are not to infer anything from the fact the witness was called

to the stand and did not testify. So I can advise them of the law that allows her not to testify, or I can just tell them they're not to infer anything. With that instruction, first of all, I don't think there's any substantial prejudice here to the defendants, but certain the jury may infer something that they probably shouldn't and what the consequences of that is, no one knows."

I would find the parading of Mrs. Allen in front of the jury to be error. It is difficult to fathom how the State could legitimately argue that they did not know that Silvy Allen would refuse to testify when the prosecutor conceded that Mrs. Allen refused to accept a subpoena prior to trial, particularly when they did not even seek to speak with her prior to calling her to the stand at trial. Arguably, there is almost as much evidence that links Silvy Allen to the crime scene as there is her husband. Silvy Allen's DNA was found on the shirt left at the murder scene, and accordingly, she would have had a legitimate right to exercise her Fifth Amendment right not to testify. Moreover, she moved to Florida with Allen shortly after the crime was committed. If this were the sole motion for mistrial in the case, again, I would agree that any substantial prejudice was promptly remedied by the trial court's curative instruction to the jury, and therefore that error was harmless.

I am troubled, though, by the inaccuracy of the trial court's instruction. A trial court should not have to misstate the law to the jury because the prosecutor committed an error.FN22

FN22. The majority fails to cite any case law in support its assertion that the trial court's instruction was correct. There is no case law, as far as the dissent is aware, that supports the contention that it is ever appropriate for a trial court to purposely give a legally incorrect jury instruction.

The court instructed the jury, "When you left, we had a witness on the stand. That witness was a Mrs. Allen, the spouse of Defendant Allen, and under the laws of our state, we have rules, evidence rules, and there's [sic] rules of competency. For example, a person of unsound mind can't testify; a child under the age of ten can't testify. Likewise, a spouse cannot testify. So once I determined she was the spouse, she was not permitted to testify."

It is simply not the law in Ohio that a spouse cannot ever testify in a court of law. While there are privilege and competency issues, to be sure, surrounding when a spouse can testify, the law is not, nor has it ever been, a blanket prohibition against a spouse testifying in court. The fact that the court had to go to such lengths to give a "curative" instruction to the jury, when the instruction was a misstatement of the law should signal to this Court that perhaps the error was not harmless, but in fact was severe enough to warrant a new trial.

The prosecutor should have determined prior to calling Mrs. Allen to the stand whether or not she would cooperate and testify. Again, were this the only error that the prosecution committed that required a curative instruction following a motion for mistrial, I would find that no prejudice occurred because the court promptly instructed the jury to disregard Mrs. Allen as a witness and any error that occurred would be harmless. However, when coupled with additional errors at trial, this "harmless" error, along with other errors, become too much to ignore.

A bell can only be unrung so many times. The culmination of these multiple errors became so overwhelming that a jury could not feasibly be expected to continue to disregard repeated violations of the rules.

Though curative measures can in some cases obviate the necessity of a mistrial, it cannot always erase the taint of improper testimony. "The giving of a curative instruction will often obviate the necessity of a mistrial. However, there are some instances in which the prejudice is so great that it is impossible 'to unring the bell.' " *Tumblin v. State* (2010), 29 So.3d 1093, quoting *Graham v. State*, 479 So.2d 824, 825–26 (Fla. 2d DCA 1985) (citation omitted).

The prosecution's tactics in this trial were prejudicial and forced Appellant into a "no win" situation. Appellant was forced to repeatedly object and make a motion for mistrial four times in the trial below. While the court denied the motions, the court did indeed find fault with the prosecution's tactics and gave curative instructions.

Based on the multiple errors in this trial, I cannot find that the Appellant received a fair trial. I find it hard to fathom if Appellant has not shown prejudice in the instant case, what it would take in order for any defendant to ever show prejudice. In the trial below, the jury heard over a week's worth of testimony which amounted to approximately 2,000 pages of transcript on review, received approximately 100 exhibits to review, and was charged with determining the guilt of Appellant and his codefendant on multiple complex charges of aggravated murder, murder, kidnapping, aggravated robbery and burglary.

If prejudice cannot be shown based on the short amount of time that the jury deliberated on such a fact-intensive case with dozens of exhibits before convicting Appellant of everything that he was charged with, then I am at a loss as to how a defendant would ever show prejudice. I would reverse the conviction based on cumulative error and as I stated in *State v. Allen,* 5th Dist. No. 09–CA–13, ––– Ohio ––––, I would order that Appellant and his codefendant be retried separately so that justice could be fairly served.

Finally, I conclude by noting that the majority, as it did in *State v. Allen*, Delaware App. No. 09–CA–13, ––– Ohio ––––, continues to incorrectly follow federal law in determining the appropriate test in ruling upon a motion to sever. See majority opinion, ¶¶ 102–112. The majority repeatedly states that Appellant has failed to show "compelling, specific, and actual prejudice" with respect to his severance argument. In so doing, the majority cites to the Sixth Circuit cases of *United State v. Saadey* (6th Cir.1993), 393 F.3d 669 and *United States v. Driver* (6th Cir.2008) 535 F.3d 424. Both of these cases deal with federal RICO charges and the severance of charges, not the severance of co-defendants. The majority fails to note that Ohio has not adopted this standard. See e.g., paragraph 203, *infra*.

The majority also cites *United States v. Lloyd*, (6th Cir.1993) 10 F.3d 1197, for the proposition that the "appellant bears the burden of making a strong showing of factually specific and compelling prejudice from a joint trial." See majority opinion, ¶ 112. However, the majority fails to point out that in *Lloyd*, the Sixth Circuit pointed out that "in reaching this conclusion, we view as significant the fact that the evidence against these defendants was simply overwhelming." *Id.* at fn. 22. Such is not the case here.

Moreover, federal courts have held that state law severance claims are governed by State law, not by federal law. *U .S. v. Hutchinson* (6th Cir.2002), 303 F.3d 720. *Phillips v. Million* (6th Cir.2004), 374 F.3d 395, (wherein federal court pointed out that they must look to Kentucky law to determine whether the motion to grant severance should be granted. In addition, they stated that *Zafiro* involved the interpretation of Federal Rules of Criminal Procedure 8, 14, an 18, not the United States Constitution, and thus *Zafiro* had no precedential weight in reviewing state court proceedings on due process grounds.) *Million*, at 393; see also *Perrou v. Jones* (E.D.Mich.2009), No. 06–14941, 2009 WL 2392971.

Court of Appeals denied Petitioner's motion for reconsideration.  See *Exhibit 46 to Return of Writ*.  On March 30, 2011, the Ohio Supreme Court accepted Petitioner's appeal on Proposition of Law Nos. VI and VII, and vacated the appellate court's judgment on Petitioner's 14th assignment of error in view of *State v. Johnson*, 128 Ohio St.3d 153 (2010)(overruling *State v. Rance*, 85 Ohio St.3d 632 (1999)), remanding the case for application of *Johnson*.  *State v. Brenson*, 128 Ohio St.3d 396 (2011). Pursuant to the remand from the Ohio Supreme Court, the state appellate court held that Petitioner's convictions on aggravated robbery should have been merged and remanded the case to the trial court for re-sentencing.  *State v. Brenson ("Brenson II")*, No. 09-CA-18, 2011 WL 1466458 (Ohio 5th Appellate Dist. April 15, 2011).

On December 22, 2011, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges that he is in the custody of the Respondent in violation of the Constitution of the United States based upon the following grounds, repeated here as set forth in Petitioner's habeas corpus petition:

---

The standard, as cited by the majority, is simply not the standard for establishing severance in Ohio courts. That standard, as set forth in State v. Torres (1981), 66 Ohio St.2d 340, 343, 421 N.E.2d 1288, is as follows. "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges has the burden of affirmatively showing that his rights were prejudiced. State v. Roberts (1980), 62 Ohio St.2d 170, 175, 405, 405 N.E.2d 247, N.E.2d 247; * * *.; see also State v. Hand, 107 Ohio St.3d 378, 2006–Ohio–18, 840 N.E.2d 151; and State v. McKnight, 107 Ohio St.3d 101, 2005–Ohio–6046, 837 N.E.2d 315. He must demonstrate that the trial court abused its discretion in refusing to separate the charges for trial. Opper v. United States (1954), 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101; Wright, Federal Practice and Procedure 468, Section 227. More specifically, he has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." Other courts have held that "error is prejudicial if there is a reasonable probability that the verdict might have been more favorable to the defendant if the error had not been made." Rolle v. State (Wyo.2010), 2010 WY 100, 236 P.3d 259, citing Vigil v. State (Wyo.2010), 2010 Wy 15, 224 P.3d 31.

For these reasons, I must dissent.

*Brenson I*,  2010 WL 3784890, at *58-66.

GROUND ONE: Brenson's right to a speedy trial was violated by the eight-year delay between his initial indictment and eventual trial.

GROUND TWO: Brenson's due process rights were violated by the eight-year delay in bringing him to trial.

GROUND THREE: Brenson was prejudiced by the trial court's refusal to sever his trial from that of Allen.

GROUND FOUR: Brenson's 2008 grand jury testimony was obtained in violation of his right to counsel and should have been suppressed.

GROUND FIVE: The prosecution abused the grand jury process by failing to tell Brenson that charges had already been filed against him (One) (1) hours before his 2008 testimony to the grand jury.

GROUND SIX: Brenson's right to an impartial jury was denied by the trial court's refusal to dismiss jurors who had been exposed to pre-trial publicity regarding this case.

GROUND SEVEN: The trial court abused its discretion and denied Brenson his right to a fair trial by failing to grant mistrials on two occasions after the jury was improperly exposed to prejudicial information.

GROUND EIGHT: The trial court erred in permitting the testimony of Brenson's prior trial attorney, (Att. Beal), because his testimony could be relevant if the jury used it to impermissible stack inferences.

GROUND NINE: In a case where the defendant had given three prior statements (over an eight (8) period) to the police and his credibility in those statements was a key issue, should the jury have been given transcripts of those statement[s] to take back into the jury room during deliberations, where they could pour over the statement[s] for any minor inconsistenc[ies]?

GROUND TEN: The trial court erred by permitting extensive evidence regarding prior crimes, wrongs and bad acts by Brenson.

-18-

GROUND ELEVEN: Brenson was denied his right to effective assistance of trial counsel.

GROUND TWELVE: Brenson was denied a fair trial by the cumulative effect of the numerous errors in his trial.

GROUND THIRTEEN: The verdict of guilty was against the manifest weight of the evidence.

It is the position of the Respondent that Petitioner's claims fail to present issues appropriate for federal habeas corpus review, are procedurally defaulted, or otherwise fail to provide a basis for relief.

## II. STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104–132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008). AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (*per curiam*). *Renico v. Lett,* 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (footnote omitted).

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly

established federal law, or based on an unreasonable determination of the facts in light

of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding

In applying this statute, the Supreme Court has held that "[t]he focus ... is on whether

the state court's application of clearly established federal law is objectively

unreasonable ... an unreasonable application is different from an incorrect one." To

obtain habeas corpus relief, a petitioner must show the state court's decision was "so

lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, –––

U.S. ––––, ––––, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011), quoting *Harrington v. Richter*,

562 –––U.S. ––––, ––––, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011). This bar is

"difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in

the state criminal justice systems,' not a substitute for ordinary error correction through

appeal." *Harrington v. Richter*, 131 S.Ct. at 786 ( quoting *Jackson v. Virginia*, 443 U.S. 307,

332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment)). In

short, "[a] state court's determination that a claim lacks merit precludes federal habeas

relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

### III.  MOTION TO STRIKE SUPPLEMENTAL RETURN OF WRIT

On March 27, 2013, Respondent filed a *Supplemental Return of Writ* "as an aid to the Court and recently appointed defense counsel," including nine photographs which are a part of the trial record.  See Doc. No. 28, PageID# 3788-89.  In that motion, Respondent goes on to summarize evidence reflecting Petitioner's guilt.

Petitioner moves to strike Respondent's *Supplemental Return of Writ* on the grounds that the rules do not permit such a filing.  Alternatively, Petitioner requests the Court to reject Respondent's *Supplemental Return of Writ* on the merits.  *See Supplemental Traverse*, Doc. No. 38, PageID# 3914.  In responding to the supplemental filing, Petitioner disputes the factual accuracy of Respondent's summary of incriminating evidence based upon citations to the trial transcript.  Neither the *Supplemental Return of Writ* nor Petitioner's response, however, affect any of the Court's conclusions or recommendations in this matter.

For the reasons set forth below, Petitioner's claim that his convictions are against the weight of the evidence (habeas corpus claim thirteen) is procedurally defaulted, and this Court therefore need not address the evidence referred to in this context.  Petitioner has not raised an independent claim of actual innocence, nor would such a claim provide him relief, so the evidence need not be considered in this context.  *Herrera v. Collins*, 506 U.S. 390, 401 (1993)("Few rulings would be more disruptive of our federal

system than to provide for federal habeas review of freestanding claims of actual innocence"); *see also House v. Bell*, 547 U.S. 518, 554-55 (2006)(declining to resolve the issue).  Further, Petitioner sets forth no new evidence not previously available indicting that this case is of the "extraordinary nature" to justify a merits review of his otherwise procedurally defaulted claims, and his arguments therefore need not be considered in this context.  *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005).

Petitioner's motion to strike is denied the *Supplemental Return of Writ* is denied.

## IV.  CLAIMS ONE AND TWO

In claims one and two, Petitioner asserts that he was denied his right to a speedy trial due to the eight-year delay between the filing of the initial *Indictment* and trial, and that his convictions therefore violate the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  *See Petitioner's Supplemental Traverse,* Doc. No. 38, PageID# 3832.

The state appellate court rejected Petitioner's claims, reasoning as follows:

> Brenson argues that his right to a speedy trial was violated by the eight-year delay between his initial indictment and his eventual trial and that his due process rights were violated by the pre-indictment delay between the dismissal of his first indictment and the filing of his second indictment.FN7
>
> FN7. Brenson is not arguing that his statutory right pursuant to R.C. 2945.71 was violated. Rather, appellant argues his constitutional right to a speedy trial under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, and, although not specifically cited in his brief, we believe appellant to be arguing further that his right to due process under the Fifth

Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution have been abrogated.

Brenson was first arrested and indicted in July 2000, but the indictment was dismissed in January 2001. Brenson was eventually re-indicted in April 2008 and brought to trial in July 2008. Brenson filed a Motion to Dismiss the Indictment on speedy trial grounds on May 23, 2008; the state responded on June 11, 2008. The trial court denied the motion by Judgment Entry filed June 13, 2008.

A speedy-trial claim involves a mixed question of law and fact. *State v. Larkin*, Richland App. No.2004–CA–103, 2005–Ohio–3122. As an appellate court, we must accept as true any facts found by the trial court and supported by competent, credible evidence. With regard to the legal issues, however, we apply a *de novo* standard of review and thus freely review the trial court's application of the law to the facts. *Id.*

When reviewing the legal issues presented in a speedy-trial claim, we must strictly construe the relevant statutes against the state. In *Brecksville v. Cook* (1996), 75 Ohio St.3d 53, 57, 661 N.E.2d 706, 709, the court reiterated its prior admonition "to strictly construe the speedy trial statutes against the state."

\*\*\*

The Sixth Amendment to the United States Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *." This provision is applicable to state courts through the Fourteenth Amendment. *Klopfer v. North Carolina* (1967), 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1. The Ohio Constitution provides similar protection.

"Section 10, Article I of the Ohio Constitution guarantees to the party accused in any court 'a speedy public trial by an impartial jury.' 'Throughout the long history of litigation involving application of the speedy trial statutes, this court has repeatedly announced that the trial courts are to strictly enforce the legislative mandates evident in these statutes. This court's announced position of strict enforcement has

been grounded in the conclusion that the speedy trial statutes implement the constitutional guarantee of a public speedy trial.' " (Citations omitted.). *State v. Pachay* (1980), 64 Ohio St.2d 218, 221, 416 N.E.2d 589, 591.

In *State v. Meeker* (1971), 26 Ohio St.2d 9, 268 N.E.2d 589, paragraph three of the syllabus, the Ohio Supreme Court held that "[t]he constitutional guarantees of a speedy trial are applicable to unjustifiable delays in commencing prosecution, as well as to unjustifiable delays after indictment." Subsequent to the Ohio Supreme Court's decision in *Meeker,* the United States Supreme Court ruled that the speedy trial guarantee under the Sixth Amendment has no applicability to pre-indictment delays. *United States v. Marion* (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468. In light of the *Marion* decision and its progeny, the Ohio Supreme Court held in *State v. Luck* (1984), 15 Ohio St.3d 150, 153, 472 N.E.2d 1097, that the Court's "holding in *Meeker* is viable only insofar as its application is limited to cases that are factually similar to it."

In *State v. Selvage* (1997), 80 Ohio St.3d 465, 687 N.E.2d 433, 1997–Ohio–287, the Ohio Supreme Court revisited the issue of whether an individual's constitutional right to a speedy trial has been violated by a delay in prosecution. In *Selvage,* the Ohio Supreme Court reaffirmed its holding in *Meeker,* and noted that the speedy trial guarantee does not apply prior to indictment when the defendant has not been the subject of "official accusation." *Id*. at 466, 687 N.E.2d 433.

In the case at bar, the trial court found that, "Brenson was the subject of official accusation at least as early as July 28, 2000, the date on which the original indictment was filed. Therefore, the Court must determine if this case is factually similar to *Meeker* in order to determine whether Brenson may assert a violation of his speedy trial right." [Judgment Entry Denying Defendant Brenson's Motion to Dismiss Indictment (Motion # 31), filed June 13, 2008 at 3]. The trial court found that the case at bar was factually distinguishable from the *Meeker* case. We agree.

In *United States v. MacDonald* (1982), 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696, the defendant was accused of

committing a murder on a military base. The military brought charges, which were eventually dropped, and the defendant was honorably discharged. Four years later, the government obtained an indictment in federal district court charging the defendant with the crime. He claimed that the delay violated his Sixth Amendment right to a speedy trial. The Fourth Circuit agreed, applying the *Barker [v. W*ingo (1972), 407 U.S. 514, 92 S.Ct. 2182] factors. 632 F.2d 258, 266–67 (4th Cir.1980). The Supreme Court reversed. 456 U.S. at 11, 102 S.Ct. 1497, 71 L.Ed.2d 696. The Court stated that the protections afforded by the speedy trial guarantee did not apply to the period after the dismissal of the military charges and before the civil indictment. During that time, the Court reasoned, there was no pretrial incarceration, no impairment of liberty associated with being released on bail, and no "disruption of life caused by arrest and the presence of unresolved criminal charges." *Id*. at 8, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696. While the defendant perhaps suffered stress or anxiety, it was no greater than any other person under criminal investigation. *Id*. at 9, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696. Thus, the Due Process Clause, rather than the Sixth Amendment, provided the appropriate framework for analyzing the delay. "The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause...." *Id*. at 8. Thus, "[a]ny undue delay" before and after the period protected by the Sixth Amendment "must be scrutinized under the Due Process Clause...." *Id*. at 7, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696; *United States v. Sanders* (6th Cir. 2006), 452 F.3d 572, 579.

The Ohio Supreme Court has espoused a similar view, "in *State v. Broughton* (1991), 62 Ohio St.3d 253, 581 N.E.2d 541, we considered a case in which a defendant was indicted on November 17, 1988, the indictment was dismissed as defective on July 18, 1989, and the defendant was later indicted on October 18, 1989. Id. at 254, 581 N.E.2d 541. This court held, 'For purposes of computing how much time has run against the state under R.C. 2945.71 et seq., the time period between the dismissal without prejudice of an original indictment and the filing of a subsequent indictment, premised upon the same facts as alleged in the

original indictment, shall not be counted unless the defendant is held in jail or released on bail pursuant to Crim.R. 12(I).' *Id.,* paragraph one of the syllabus." *State v. Azbell* (2006), 112 Ohio St.3d 300, 859 N.E.2d 532, 2006–Ohio–6552 at ¶ 17. (Emphasis added).

In the case at bar, the trial court ordered Brenson released upon the dismissal of the previous indictment in January 2001. Because no charge was outstanding and he was not held pending the filing of new charges or released on bail or recognizance while awaiting the re-filing of charges Brenson did not become a "person against whom a charge of felony is pending" until he was arrested on the indictment in April 2008. *Azbell, supra* at ¶ 20.

Thus, if a defendant is the subject of official accusation prior to indictment, the four-part test applicable to alleged constitutional speedy trial violations set forth in *Barker v. Wingo* (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 governs. *State v. Flickinger* (Jan. 19, 1999), Athens App. No. 98 CA 09 at n. 1. When the defendant is not the subject of official accusation, however, a delay in commencing prosecution does not implicate the defendant's constitutional speedy trial rights. *United States v. Marion* (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468; *State v. Luck* (1984), 15 Ohio St.3d 150, 153, 472 N.E.2d 1097, 1102. Additionally, when the government voluntarily dismisses charges, the Sixth Amendment does not require counting the time between indictments. Rather, in either case, the defendant may assert that the delay in commencing prosecution violated his due process rights under the Fifth Amendment and under Section 16, Article I of the Ohio. *United States v. Lovasco* (1977), 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752; *United States v. Marion* (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468; *State v. Luck* (1984), 15 Ohio St.3d 150, 153–54, 472 N.E.2d 1097, 1102. As the trial court recognized in the case at bar, the Sixth Amendment has no application to the case at bar. However, as the second syllabus in *Luck* states, "[a]n unjustified delay between the commission of an offense and a defendant's indictment therefore, which results in actual prejudice to the defendant, is a violation of the right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendment to

the United States Constitution." *Luck*, 15 Ohio St.3d at 154, 472 N.E.2d at 1102. See also, *United States v. Lovasco* (1977), 431 U.S. 783, 789–790, 97 S.Ct. 2044, 2049, 752; *Marion*, 404 U.S. at 324, 92 S.Ct. at 465, Furthermore, any claim of prejudice, such as the death of a key witness, lost evidence, or faded memories, must be balanced against the other evidence in the case in order to determine whether the defendant will suffer actual prejudice at trial. *Luck*, *supra*.

When a defendant asserts a pre-indictment delay violated his due process rights, prejudice may not be presumed. *United States v. Crouch* (C.A.5, 1996), 84 F.3d 1497, 1514–1515. The notion that prejudice may be presumed from a lengthy delay arises in the context of the four-part balancing test used in determining whether a post-indictment or post-accusation delay has deprived a defendant of his Sixth Amendment right to a speedy trial. *Barker v. Wingo* (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. The *Barker* four-part test, and the concept of presumptive prejudice, applies only to post-indictment or post-accusation delays that implicate the Sixth Amendment right to a speedy trial, and has no application to pre-indictment delays. *See, State v. Metz* (1998), Washington App. No. 96CA48, (Citation omitted); *State v. Harrell* (Dec. 29, 1998), Delaware App. No. 98CAA06029.

The Ohio Supreme Court held that a delay in the commencement of prosecution by the state would be found unjustified when it is done in an attempt to gain a tactical advantage over the defendant, or when the state "through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." *Luck*, 15 Ohio St.3d at 158, 472 N.E.2d 1097. The Court also held that the length of delay would normally be a key factor in this determination. *Id*.

In the case at bar, Brenson claims that the following prejudice has resulted from the delay between the dismissal of the original indictment and his re-indictment: (1) memories of witnesses have undoubtedly faded; (2) key evidence pertaining to the case is likely to have been lost

and/or destroyed; (3) current addresses and/or other contact information for key witnesses is not currently known to Brenson which may prejudice his efforts to effectively investigate this case and possible defenses available to him; (4) key witnesses may have died; and (5) Brenson has been taken away from his wife and family. Brenson argues that the foregoing factors, when viewed in light of the state's reason for the delay in prosecution of this case, warrants dismissal of the indictment on due process grounds.

The trial court found, "The prejudice that Brenson alleges in this case is potential prejudice and not actual prejudice. Brenson knows of no evidence or witnesses that are no longer available. Rather, Brenson merely speculates that witnesses may have died or that their memories may have faded."

The defendant has the burden of demonstrating prejudice. E.g., *United States v. Lawson* (6th Cir. 1985), 780 F.2d 535, 541–42. A lengthy delay in prosecuting the defendant, by itself, does not constitute actual prejudice. The defendant must demonstrate how the length of the delay has prejudiced his ability to have a fair trial. *United States v. Norris* (S.D .Oh.2007), 501 F.Supp.2d 1092, 1096. In *United States v. Wright* (6th Cir. 2003), 343 F.3d 849, 860, the Court held that loss of memory is insufficient to establish prejudice as a matter of law.

In the case at bar, Brenson has failed to demonstrate how the testimony of "key" witnesses would have provided him with exculpatory evidence. Brenson has also failed to identify and demonstrate that key physical evidence is no longer available. Because Brenson has not provided the Court with a sufficient explanation of how his defense has been affected negatively by the pre-indictment delay, the Court cannot find that Brenson has suffered substantial prejudice.

As the court stated in *State v. Glasper* (Feb. 2, 1997), Montgomery App. No. 15740, "The defendant will not satisfy his or her burden of proof by merely generally alleging the possible prejudice inherent in any delay, for example, that memories have faded, witnesses may be

inaccessible, and evidence may be lost. The defendant must identify the specific prejudice suffered, and that prejudice must be substantial, for instance, that important taped witness interviews were destroyed or that key witnesses have died." In *State v. Flickinger, supra* the court noted, "a defendant must provide concrete proof that he will suffer actual prejudice at trial as a result of the government's delay in indicting the defendant. *See, e.g., Crouch*, 84 F.3d at 1515 (stating that vague assertions of faded memories are insufficient to establish actual prejudice; the defendant must state which witness is unable to fully recount the details of the crime and how the witness' lapsed memory will prejudice the defense); *United States v. Beszborn* (C.A.5, 1994) 21 F.3d 62, 67, certiorari denied sub nom, *Westmoreland v. United States*, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 288 (stating that vague assertions of faded memories are insufficient to establish actual prejudice); *United States v. Stierwalt* (C.A.8, 1994), 16 F.3d 282, 285 (stating that assertions of faded memories are insufficient to establish actual prejudice when the defendant fails to specify how witness' lapsed memory will harm his defense); *United States v. Harrison* (S.D.N.Y.1991), 764 F.Supp. 29, 32 (stating that assertion of faded memories is insufficient to establish actual prejudice); *United States v. Greer* (D.Vt.1997), 956 F.Supp. 525, 528 (stating that a defendant must present concrete proof of actual prejudice and not mere speculation of actual prejudice)". *State v. Flickinger* (Jan. 19, 1999), Athens App. No. 98 CA 09A.

In the case *sub judice*, we believe that Brenson's assertion that witnesses' memories have faded, that key evidence pertaining to the case is likely to have been lost and/or destroyed, and that current addresses and/or other contact information for key witnesses is not currently known to Brenson which may prejudice his efforts to effectively investigate this case and possible defenses available to him are much too speculative and fail to rise to the level of concrete proof.

We find, therefore, that Brenson has failed to establish that the delay in bringing the indictment caused Brenson actual prejudice.

*Brenson I*, 2010WL 3784890, at *5-10.

Petitioner asserts that the prosecutor acted in a grossly negligent and careless manner in delaying the prosecution against him. He asserts that the prosecution delayed the re-filing of the *Indictment* in an improper attempt to persuade co-defendant Allen to testify against Petitioner, and in order to unfairly obtain Petitioner's inconsistent statements for use against him. *Corrected Memorandum in Support*, Doc. No. 4, PageID# 165. Petitioner asserts he suffered prejudice because numerous witnesses indicated that their memories had faded, the prosecution exploited the use of his inconsistent statements at trial, fireworks taken from the murder victim's basement were lost, and Darla and David Herron, potential defense witnesses, were no longer available.[2] PageID# 166-67. Petitioner also refers to the loss of potential witness Floyd Bell, who died prior to the re-indictment, and who purportedly would have testified that Herrell was alive when Petitioner left Herrell's home. Petitioner asserts that Floyd Bell's wife would have corroborated that Petitioner went to see Herrell to purchase fireworks. Petitioner states that he was unable to locate Bell's wife, but does not indicate how the passage of time caused that to be so. *Reply,* Doc. No. 19, PageID# 3654-55.

---

[2] David Herron died prior to trial, and Darla Herron suffered from dementia. *Trial Transcript*, at 2315–20 Darla Herron told police she saw two white males "messing around with their truck." ECF No. 39–1, PageID # 3937. One of them threw a beer bottle into her front yard, which upset her. She woke up her husband, David Herron, and they watched the two males walk down Noble Street to London Road returning and carrying items into a pink house. David Herron indicated the men were carrying a garbage bag and carrying it into the pink house on High Street. They said that Herrell's security lights kept coming on and off. They suspected Herrell's son, Mike had something to do with the murder. Neither David nor Darla could identify the men.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a speedy and public trial.  U.S. Const. Amend. VI.  However, it is the Due Process Clause of the Fifth Amendment, and not the Sixth Amendment, that protects against excessive pre-indictment delay.  *Barawskas v. Caruso*, 2006 WL 3104038, at *2 (E.D. Mich. Oct. 31, 2006)(citing *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992)).  " The Speedy Trial Clause does not apply to pre-indictment delay because 'only 'a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge ... engage the particular protections' of that provision.'"  *Id.* (citing *Lovasco*, 431 U.S. at 788-89 (quoting *United States v. Marion,* 404 U.S. 307, 320 (1971)).  The Constitution does not require prosecutors to

> file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," *United States v. Ewell*, [383 U.S. 116, 120 (1966) ].

*Lovasco,* 431 U.S. at 791.  The Due Process Clause of the Fifth Amendment requires dismissal of the charges only where pre-indictment delay caused "substantial prejudice" to a criminal defendant's right to a fair trial and was an "intentional device to gain tactical advantage over the accused."  *United States v. Marion*, 404 U.S. 307, 322 (1971).  To obtain relief, the Petitioner must establish both that the government had no valid reason for the delay or that some tactical advantage was sought to be obtained by the delay."  *United States v. DeClue*, 899 F.2d 1465, 1468 (6th Cir.1990)(citing *Payne v.*

*Rees*, 738 F.2d 118, 122 (6th Cir. 1984); *United States v. Greene*, 737 F.2d 572, 574 (6th Cir. 1984). Petitioner cannot meet this requirement here.  The government has stated a valid reason for delay in prosecution – to obtain further evidence.

> [I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused". . . . Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*Lovasco*, 431 U.S. at 795-796 (footnotes and citations omitted). Thus, "to prosecute a defendant following investigative delay does not deprive [Petitioner] of due process, even if his defense might have been somewhat prejudiced by the lapse of time."  *Id.* at 796.  The record does not support a conclusion that police were failing at all to pursue investigation of the charges during the time period at issue, s*ee Exhibits to Motion for Discovery*, PageID #3934-40, and in order to obtain relief under a claim involving pre-indictment delay, the petitioner must establish both improper reasons for the delay and prejudice.  *United States v. Brown*, 498 F.3d 523, 528 (6th Cir. 2007)(citations omitted). Petitioner has failed to do so here.

> The Sixth Circuit has repeatedly held that where the pre-indictment delay is caused merely by negligence on the part of prosecutors or police, no due process violation exists. *U.S.*

> *v. Rogers*. 118 F.3d 466, 476 (6th Cir. 1997) (rejecting the
> argument that "reckless or negligent disregard of a
> potentially prejudicial circumstance violates the Fifth
> Amendment guarantee of due process"); *See also U.S. v.
> Banks*, 27 Fed. Appx. 354, 357 (6th Cir. 2001) ("Our Circuit
> has recognized that where delay is due to simple negligence
> and not a concerted effort by the government to gain an
> advantage, no due process violation exists"). Finally, where
> a habeas petitioner fails to show that the prosecutor delayed
> the prosecution for illegitimate reasons, it is unnecessary for
> a court to determine whether the petitioner satisfies the
> "substantial prejudice" requirement. *See Wolfe v. Bock*, 253
> Fed. Appx. 526, 532 (6th Cir. 2007) (petitioner failed to
> establish that 15–year delay between murder and his arrest
> was for illegitimate reasons, as was required to support
> claim that delay violated petitioner's due process right to a
> fair trial).

*McGuire v. Ludwick*, No. 2:07-cv-15399, 2009 WL 2476452, at *6 (E.D. Mich. Aug. 11,

2009). "It is well-established that a delay resulting from investigative efforts 'does not

deprive [a defendant] of due process, even if his defense may have been somewhat

prejudiced by the lapse of time.'" *United States v. Rogers*, 118 F.3d 466, 475-76 (6th Cir.

1977)(citing *United States v. Atisha*, 804 F.2d 920, 928 (6th Cir.1986) (citations omitted),

cert. denied, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Lovasco*,

431 U.S. at 796 (1977) (holding that "to prosecute a defendant following investigative

delay does not deprive him of due process, even if his defense might have been

somewhat prejudiced by the lapse of time")). The Supreme Court in *Marion* explained:

> Appellees rely solely on the real possibility of prejudice
> inherent in any extended delay: that memories will dim,
> witnesses become inaccessible, and evidence be lost. In light
> of the applicable statute of limitations, however, these
> possibilities are not in themselves enough to demonstrate
> that appellees cannot receive a fair trial and to therefore
> justify the dismissal of the indictment.

*Marion*, 404 U.S. at 235-26.

Claims one and two fail to warrant habeas corpus relief.

## V.  CLAIM THREE

In claim three, Petitioner asserts that he was denied a fair trial because the trial court refused to sever his trial from that of the co-defendant William T. Allen, and DNA evidence establishing Allen's identity as the murderer unfairly prejudiced him. *Corrected Memorandum in Support*, Doc. No. 4, PageID# 168-69.   Petitioner additionally asserts that the trial court's denial of his motion to sever trials violated Ohio law.

The state appellate court reviewed this claim as follows:

> Brenson asserts that the trial court erred in refusing to sever his trial from that of his codefendant, William Allen. We disagree.

> Brenson and Allen were jointly indicted on seven counts related to the murder of Norman Herrell. In count one, both men were charged with the aggravated murder of Herrell under R.C. 2903.01(A). In count two, they were charged with the aggravated murder of Herrell under R.C. 2903.01(B). In count three, they were charged with Herrell's murder under R.C. 2903.02(B). In count four, they were charged with kidnapping under R.C. 2905.01(A)(2). In count five, they were charged with kidnapping under R.C. 2905.01(A)(3). In counts six and seven, the men were charged with aggravated robbery, in violation of R.C. 2911.01(A)(3) and R.C. 2911 .01(A)(1), respectively.

> Defendants may be charged in the same indictment, pursuant to Ohio Crim. R. 8(B) as follows:

> "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together

-34-

or separately, and all of the defendants need not be charged in each count."

The law favors the joinder of defendants and the avoidance of multiple trials because joinder conserves judicial and prosecutorial time, lessens the expenses of multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries. *State v. Thomas* (1980), 61 Ohio St.2d 223, 400 N.E.2d 401.

In order to obtain a severance, a defendant needed to affirmatively demonstrate prejudice by the joinder. Crim.R. 14. Crim R. 14 provides, in pertinent part:

"If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, information or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. In ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(B)(1)(a) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial."

The United States Supreme Court has stated, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States* (1993), 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317. Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. Indeed, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States v. Causey* (6th Cir.1987), 834 F.2d 1277, 1287. Thus, to prevail on his severance argument, an appellant must show "compelling, specific, and actual prejudice from [the] court's refusal to

grant the motion to sever." *United States v. Saadey* (6th Cir. 2005), 393 F.3d 669, 678; *United States v. Driver* (6th Cir. 2008), 535 F.3d 424, 427.

In this assignment of error, Brenson argues that the error at issue in this case, i.e. failure to conduct separate trials, created a risk that the jury would convict Brenson based on evidence that was attributable to his co-defendant, Allen.

Brenson's Pre–Trial Motion to Sever

In the case at bar, Allen filed a Motion for Relief from Prejudicial Joinder (Motion # 30), filed on April 21, 2008, and Brenson's filed a Motion to Sever Trial (Motion # 29), filed on April 25, 2008. The State of Ohio filed responses on April 24, 2008 and April 28, 2008, respectively. On April 30, 2008, the trial court ordered that any statements of Allen and Brenson be provided to the Court under Crim.R. 14. The State filed a Summary of Statements on May 8, 2008, and filed a Supplemental Summary of Statements for Virgil McClendon's Anticipated Testimony on May 14, 2008. Brenson filed a supplemental memorandum in support of his motion to sever on May 12, 2008. Allen filed a response to the State's Summary of Statements on May 15, 2008. The State filed a response to Allen's Response on May 16, 2008. Allen filed a reply thereto on May 19, 2008. The State also filed a response to Brenson's supplemental memorandum on May 19, 2008.

The burden is upon the defendant to show good cause why a separate trial should be granted. In order to determine whether the trial court correctly ruled upon Brenson's pre-trial motion to sever filed May 23, 2008, we must review the evidence Brenson and Allen presented to the trial court in support of each motion. Further, we must examine the trial court's review of that evidence when it denied the pre-trial motion to sever to determine whether Brenson and/or Allen affirmatively demonstrate prejudice by the joinder thereby demonstrating the trial court abused its discretion by overruling either or both pre-trial motions to sever.

In determining whether to sever the trials of Allen and Brenson, the trial court reviewed the summary of statements filed by the State, in addition to the following: (1) interview

with Allen on February 13, 2006; (2) interview with Allen on June 15, 2006; (3) interview with Allen on August 9, 2007; (4) interview with Brenson on January 14, 2003; (5) grand jury testimony of Brenson on April 18, 2002; (6) grand jury testimony of Brenson on April 15, 2008; (7) summary of statements of Allen to Virgil McClendon; and (8) statements of Brenson to Allen contained in letters. Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 2.

In reviewing the grounds submitted in support of the motions, the trial court noted, "Both Defendants maintain that certain statements made by the codefendant may tend to incriminate the other defendant without the opportunity to cross-examine the co-defendant about the statement." Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 4.

The trial court addressed the statements made by Allen. Law enforcement officers interviewed Allen on February 13, 2006, June 15, 2006, and August 9, 2007. During these interviews, Allen admitted that he knew Brenson and that he met him at the Ohio Penitentiary. Allen further stated that he had never been to Delaware, Ohio. None of the statements made by Allen during these interviews are inculpatory of Brenson. Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008. The trial court found, "The statements made by Allen do not implicate Brenson in any wrongdoing; thus, the statements are not made "against" Brenson and the Sixth Amendment right to confrontation is not triggered. Thus, the statements made by Allen during his interviews are admissible. Judgment Entry denying Defendant Allen's Motion for Relief From prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 6–7.

The State also sought to admit statements that Allen made to a cellmate, Virgil McClendon. The summary of McClendon's

statement was presented to the Court in a supplemental summary filed on May 14, 2008. Brenson argued, "that McClendon will likely testify as to statements allegedly made by Allen in which he confessed to his involvement in the crimes charged. Specifically, Allen allegedly stated to McClendon that he committed the crimes with a friend who had previously been charged with the crimes, but the charges had been dismissed. Brenson argues that there is no question that the "friend" referred to by Allen could only be Brenson, as Brenson is the only other person previously charged with these crimes. Brenson contends that the State's attempt to elicit these extra judicial statements by Allen will deny Brenson his right to cross-examination." Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 7.

The State countered that "the majority of Allen's statements were not made against Brenson; therefore, the statements do not trigger the Confrontation Clause. The State suggests that any of Allen's statements, which do implicate Brenson, can be redacted prior to their admission at trial without violating Bruton. Brenson similarly argues that if the Court permits joinder, it should apply the ruling of Marsh by redacting from Allen's statements to McClendon any mention of the involvement of another individual in the death of the victim.

The trial court ruled, "After reviewing the summary of McClendon's anticipated testimony, the Court determines that it will permit the testimony of McClendon regarding the statements made to him by Allen, except for the statements Allen made that 'they had let one guy go for the same murder.' " Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 7–8.

The trial court next reviewed the argument that both Allen and Brenson raised that they will be presenting mutually antagonistic defenses, and thus a joint trial will violate their constitutional rights. The trial court noted, "Brenson generally argues that the Defendants will present mutually antagonistic and hostile defenses." Judgment Entry Denying

Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 9.

The trial court found that "Brenson fails to set forth any facts to establish any risk of prejudice." Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 9. The trial court ruled, "Allen fails to demonstrate how Brenson's statements regarding his relationship with the victim or his purchase of illegal fireworks from the victim results in the presentation of antagonistic defenses by the defendants ... Moreover, the trial court can give instructions to the jury relating to multiple defendants—that the jury must separately decide the question of guilt or innocence of each of the defendants—thereby curing any risk of prejudice in this case." Id. at 9.

Mutually Antagonistic Defenses

A defendant is not entitled to severance based upon mutually antagonistic defenses unless "there is a serious risk that a joint trial could compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States* (1993), 506 U.S. 534, 539, 113 S.Ct. 933, 937, 122 L.Ed.2d 317.

"A defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the codefendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *United States v. Berkowitz* (C.A.5, 1981), 662 F.2d 1127, 1133. (Internal quotation marks omitted). *Accord, State v. Walters*, Franklin App. No. 06AP–693, 2007–Ohio–5554, at ¶ 23; *State v. Evans*, Scioto App. No. 08CA3268, 2010–Ohio–2554 at ¶ 43.

"Notwithstanding such assertions, the courts have reversed relatively few convictions for failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses. See, *e.g., United States v. Tootick*, 952 F.2d 1078 (C.A.9 1991); *United States v. Rucker*, 915 F.2d 1511, 1512–1513 (C.A.11 1990); *United States v. Romanello*, 726 F.2d 173 (C.A.5 1984). The low rate of reversal may reflect the inability of defendants to prove a risk of prejudice in most cases." *Zafiro v. U.S.* (1993), 506 U.S. 534, 538, 113 S.Ct. 933, 937, 122 L.Ed.2d 317.

After a thorough review of the record, we find no evidence suggesting that Brenson and Allen intended to present, or did present antagonistic defenses at trial. Rather it is clear in the case at bar that both Brenson and Allen maintained that he had nothing to do with the murder. Neither party presented testimony or evidence to incriminate the other person. Further, the state did not introduce the fact that Allen had made statements to a cellmate confessing his involvement in the crime and inculpating himself and Brenson.

Accordingly, based on the record before the trial court when Brenson filed his written pretrial motion to sever the trial, and based upon the evidence presented at trial, we conclude that the trial court did not abuse its discretion in granting the motion in part, and denying that motion in part.

Our inquiry, however, does not end there. Brenson also claims that, as the trial developed, he was substantially prejudiced by the joint trial. In the case at bar, Brenson renewed his objection to the trial court's overruling his pre-trial motion to sever prior to the close of the evidence. (13T. at 1810–1812).

Spill Over Doctrine

Brenson argues, in essence, that the evidence against Allen is more damaging than the evidence against him.

In a case involving several defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as the basis for

convicting another defendant not connected to the evidence. The existence of ... a "spill-over" or "guilt transference" effect turns in part on whether the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled. *United States v. Gallo* (6th Cir. 1985), 763 F.2d 1504, 1526. (Citing *United States v. Tolliver* (2nd Cir. 1976), 541 F.2d 958, 962). The primary concern is whether the jury will be able to segregate the evidence applicable to each defendant and follow the limiting instructions of the court as they apply to each defendant. *Opper v. United States* (1954), 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101; See, e.g., *Kotteakos v. United States* (1946), 328 U.S. 750, 766–74, 66 S.Ct. 1239, 1248–52, 90 L.Ed. 1557,(number of defendants); *Blumenthal v. United States* (1947), 332 U.S. 539, 560, 68 S.Ct. 248, 257, 92 L.Ed. 154,(trial judge's instructions). *United States v. Flaherty* (1st Cir. 1981), 668 F.2d 566, 582; *United States v. Causey* (6th Cir. 1987), 834 F.2d 1277.

The phrase "prejudicial to the rights of the accused" means something more than that a joint trial will probably be less advantageous to the accused than separate trials. Such a party must show more than that a separate trial would have given him a better chance for acquittal. *United States v. Gallo, supra* at 1526. The United States Supreme Court has stated, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States* (1993), 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317.

The violation of one of his substantive rights by reason of the joint trial include: unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant. See *United States v. Camacho* (9th Cir.) 528 F.2d 464, 470, cert. denied, 429 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976); *United States v. Fernandez* (9th Cir.2004), 388 F.3d 1199, 1241.

It is difficult to meet this burden by claiming that the jury probably considered evidence against one defendant that was introduced only against another: "juries are presumed to be capable of following instructions regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Franklin* (6th Cir. 2005), 415 F.3d 537, 556 (citations omitted).

Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro v. United States, supra.* Indeed, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States v. Causey* (6th Cir. 1987), 834 F.2d 1277, 1287. Thus, to prevail on his severance argument, an appellant must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Saadey* (6th Cir. 2005), 393 F.3d 669, 678; *United States v. Driver* (6th Cir. 2008), 535 F.3d 424, 427; Crim.R. 14.

In the case at bar Brenson failed to establish specific and actual prejudice.

In the case at bar, before deliberations, the trial court specifically admonished the jury that "Evidence may be admitted against one defendant, even though it must not be considered as evidence against the other defendant. You must carefully separate such evidence and consider it only as to the defendant to whom it applies. A statement by one defendant made outside the presence of the other defendant is admissible as to the defendant making such statement and must not be considered for any purpose as evidence against the other defendant.

"You must decide separately the question of whether one or both defendants are guilty or not guilty. If you cannot agree on a verdict as to both defendants, but do agree as to one, you must render a verdict as to the one upon whose guilty or not guilty finding you agree." (17T. at 2588).(See also Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant

Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 9).

Brenson does not challenge the clarity of these instructions. These instructions sufficed to cure any possibility of prejudice. *Zafiro, supra* 506 U.S. at 450, 113 S.Ct. at 939.

In *Bruton v. United States* (1968), 391 U.S. 123, 135–136, 88 S.Ct. 1620, 20 L.Ed.2d 476, the United States Supreme Court noted:

" * * * Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. "A defendant is entitled to a fair trial but not a perfect one." * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information."

"A presumption always exists that the jury has followed the instructions given to it by the trial court," *Pang v. Minch* (1990), 53 Ohio St.3d 186, 187, 559 N.E.2d 1313, at paragraph four of the syllabus, rehearing denied, 54 Ohio St.3d 716, 562 N.E.2d 163, approving and following *State v. Fox* (1938), 133 Ohio St. 154, 12 N.E.2d 413; *Browning v. State* (1929), 120 Ohio St. 62, 165 N.E. 566. Brenson has not cited any evidence in the record that the jury failed to follow the trial court's instruction.

"[A] defendant is not entitled to a severance simply because the evidence against a co-defendant is far more damaging than the evidence against him. As we noted in *United States v. Warner*, 690 F.2d 545, 553 (6th Cir. 1982): 'We recognize that, in a joint trial, there is always a danger that the jury will convict on the basis of the cumulative evidence rather than on the basis of the evidence relating to each defendant. However, we adhere to the view, as previously stated by our court, that '[t]he jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately.' *Id.* (citations omitted). The presentation of evidence applicable to more than one defendant is simply a fact of life in multiple defendant cases." *Driver, supra* 535 F.3d at 427. (Quoting *Causey, supra* 834 F.2d at 1288).

Brenson concedes "the vast majority of the evidence focused on Brenson and his activities"; however he claims that, "the most incriminating piece of evidence was exclusively related to Allen [, i.e.] the DNA on the bloody glove, which was the only evidence that directly tied either defendant to the murder". [Appellant's Brief at 39].

In this case, we find that Brenson did not meet his burden of demonstrating specific and actual prejudice because of the admission of this evidence in a joint trial with Allen. There was no evidence that the jury was not able to heed the trial court's instruction to consider separately the evidence against each defendant, and Brenson failed to establish that a specific trial right was compromised because of this evidence. The appellant bears the burden of making a strong showing of factually specific and compelling prejudice resulting from a joint trial. *United States v. Lloyd*, (6th Cir. 1993), 10 F.3d 1197, 1215–1216; *United States v. Warner, supr*a 971 F.2d at 1196. Brenson makes only a generalized argument with no factually specific and compelling prejudice argued or demonstrated by the record.

In addition, the DNA evidence cited by Brenson was relevant and admissible against him in a separate trial FN8. Brenson overlooks the fact that the jury was instructed on complicity. (17T. at 2587). R.C. 2923.03 provides: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

FN8. Evidence that Brenson and Herrell met while in prison was not objected to at trial. (14T. at 1983–1984). Accordingly, Brenson has waived all but plain error. *State v. Grubb* (1986), 28 Ohio St.3d 199, 203,503 N.E.2d 142; *Puckett v. United States* (2009), ––– U.S. ––––, ––––, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266. omitted).

" * * *

"(2) Aid or abet another in committing the offense ."

R.C. 2923.03(F) states, "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

"The Supreme Court of Ohio clarified Ohio's position on the issue of complicity in *State v. Perryman* (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, vacated in part on other grounds sub nom, *Perryman v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156. The court unequivocally approved of the practice of charging a jury regarding aiding and abetting even if the defendant was charged in the indictment as a principal. *Id*. The court held that the indictment as principal performed the function of giving legal notice of the charge to the defendant. *Id*. Therefore, if the facts at trial reasonably supported the jury instruction on aiding and abetting, it is proper for the trial judge to give that charge. *Perryman, supra* at 27, 28." *State v. Payton* (April 19, 1990), 8th Dist. Nos. 58292, 58346.

R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. *See State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407–408. *State v. Herring* (2002), 94 Ohio St.3d 246, 251 762 N.E.2d 940, 949.

"[To] support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus.

Although the state need not establish the principal's identity, it must, at the very least, prove that a principal committed the offense. *State v. Perryman* (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph four of the syllabus; *State v. Hill* (1994), 70 Ohio St.3d 25, 28, 635 N.E.2d 1248, 1251. However, the state does not need to prove that the accomplice and principal had a specific plan to commit a crime. *Johnson*, 93 Ohio St.3d at 245, 754 N.E.2d 796. The fact that the defendant shares the criminal intent of the principal may be inferred from the circumstances surrounding the crime, which may include the defendant's presence, companionship, and conduct before and after the offense is committed. Id. at 245–246, 754 N.E.2d 796. This is a situation where

"[c]ircumstantial evidence and direct evidence inherently possess the same probative value," *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus, because "[t]he intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be." *In re Washington*, 81 Ohio St.3d 337, 340, 1998–Ohio–627, quoting *State v. Huffman* (1936), 131 Ohio St. 27, 1 N.E.2d 313, paragraph four of the syllabus.

Accordingly, because Brenson could be found guilty of aiding and abetting Allen in the commission of the crimes with which he was charged, and vice versa, evidence relating to Allen is relevant to Brenson's trial and would be admissible in a separate trial. Evidence that Allen's DNA was found at the scene would be non-testimonial and admissible.

DNA samples have been held to be non-testimonial evidence with respect to the Fifth Amendment privilege against self-incrimination. *State v. Bruce*, Fairfield App. No.2006–CA–45, 2008–Ohio–5709 at ¶ 48. A DNA sample obtained from a state prisoner, pursuant to Ohio statute requiring the collection of DNA specimens from convicted felons, was physical, rather than testimonial evidence, and thus did not implicate the prisoner's Fifth Amendment privilege against self-incrimination. *Wilson v. Collins* (C.A.6, 2008), 517 F.3d 421, 431. The Court reasoned that a DNA sample was analogous to a photograph or fingerprint identifying an individual. Id. (Citing *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007) (citing *Schmerber v. California*, 384 U.S. 757, 765, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that "blood test evidence, although an incriminating product of compulsion, [is] neither [ ] testimony nor evidence relating to some communicative act or writing" and is therefore not protected by the Fifth Amendment)).

Evidence that an accomplice and principal were acting together can be shown by evidence the accomplice accompanied the principal to the scene of the crime. *State v. Johnson, supra* 93 Ohio St.3d at 244, 754 N.E.2d 800; *State v. Jones* (Sept. 20, 2001), 8th Dist. No. 78545; *State v. Rodriguez*

(May 17, 2000), 9th Dist. No. 98CA007255; *In re Moore* (Feb. 3, 2000), 8th Dist. No. 75673. Finding Allen's DNA in the general vicinity of Brenson's fingerprints and a blood soaked glove in the home of the victim could support an inference that Brenson supported, assisted, encouraged, and cooperated with Allen in the commission of the crimes FN9.

FN9. Evidence concerning the search and inventory of Brenson's vehicle was stricken by the court and the jury was instructed to disregard such evidence. This evidence is more fully addressed in relation to appellant's seventh assignment of error, infra.

In the case at bar, the evidence against Allen was easily identifiable and capable of being separately identified and compartmentalized by the jury. We find that Brenson did not meet his burden of demonstrating compelling, specific, and actual prejudice because of the admission of Allen's DNA evidence in Brenson's joint trial with Allen. The mere fact that there "is a substantial difference in the amount of evidence adduced against each defendant ... is not grounds to overturn a denial of severance unless there is a substantial risk that the jury could not compartmentalize or distinguish between the evidence against each defendant." *Clark v. O'Dea*, 257 F.3d 498, 504 (6th Cir. 2001) ( quoting *United States v. Lloyd*, 10 F.3d 1197, 1215 (6th Cir. 1993)). Moreover, this case, while lengthy, was not a case of such complexity that the jury could not compartmentalize the evidence. *United States v. Lloyd, supra* 10 F.3d at 1216. We do not think there was any significant danger of jury confusion, let alone such a danger as would warrant a severance.

We decline to hold that a separate trial is necessary whenever any potentially incriminating evidence against one codefendant is introduced during a joint trial. *See Richardson v. Marsh, supra*, 481 U.S. at 209–10, 107 S.Ct. 1702, 95 L.Ed.2d 176. In the absence of a showing to the contrary, the jury is presumed to have followed the instructions of the court. *State v. Negron, supra*, 221 Conn. at 331, 603 A.2d 1138; see also *Richardson v. Marsh, supra*, at 206, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176. The mere fact that there "is a substantial difference in the amount of evidence adduced against each defendant ... is not grounds to overturn a denial

of severance unless there is a substantial risk that the jury could not compartmentalize or distinguish between the evidence against each defendant." *Clark v. O'Dea*, 257 F.3d 498, 504 (6th Cir. 2001) ( quoting *United States v. Lloyd*, 10 F.3d 1197, 1215 (6th Cir. 1993)). Moreover, this case, while lengthy, was not a case of such complexity that the jury could not compartmentalize the evidence. *United States v. Lloyd, supra* 10 F.3d at 1216. We do not think there was any significant danger of jury confusion, let alone such a danger as would warrant a severance.

As such, we conclude that the danger of prejudice due to the "spillover" of evidence is insufficient to justify severance for Brenson.

Because Brenson has not shown that his joint trial subjected him to any legally cognizable prejudice, we conclude that the trial court did not abuse its discretion in denying Brenson's motion for severance. *Zafiro, supra* 506 U.S. at 450, 113 S.Ct. at 939.

Accordingly, Brenson's third assignment of error is overruled.

*Brenson I*, 2010 WL 3784890, at *11-20.

Petitioner refers to the dissenting opinion in *Brenson I*, in support of his claim,

*Traverse*, Doc. No. 19, PageID# 3655, which indicates in relevant part as follows:

I conclude by noting that the majority, as it did in *State v. Allen*, Delaware App. No. 09-CA-13, --- Ohio ----, continues to incorrectly follow federal law in determining the appropriate test in ruling upon a motion to sever. See majority opinion, ¶¶ 102–112. The majority repeatedly states that Appellant has failed to show "compelling, specific, and actual prejudice" with respect to his severance argument. In so doing, the majority cites to the Sixth Circuit cases of *United State v. Saadey* (6th Cir. 1993), 393 F.3d 669 and *United States v.* Driver (6th Cir. 2008) 535 F.3d 424. Both of these cases deal with federal RICO charges and the severance of charges, not the severance of co-defendants. The majority

fails to note that Ohio has not adopted this standard. See e.g., paragraph 203, infra.

The majority also cites *United States v. Lloyd,* (6th Cir. 1993) 10 F.3d 1197, for the proposition that the "appellant bears the burden of making a strong showing of factually specific and compelling prejudice from a joint trial." See majority opinion, ¶ 112. However, the majority fails to point out that in *Lloyd,* the Sixth Circuit pointed out that "in reaching this conclusion, we view as significant the fact that the evidence against these defendants was simply overwhelming." Id. at fn. 22. Such is not the case here.

Moreover, federal courts have held that state law severance claims are governed by State law, not by federal law. *U .S. v. Hutchinson* (6th Cir. 2002), 303 F.3d 720. *Phillips v. Million* (6th Cir.2004), 374 F.3d 395, (wherein federal court pointed out that they must look to Kentucky law to determine whether the motion to grant severance should be granted. In addition, they stated that *Zafiro* involved the interpretation of Federal Rules of Criminal Procedure 8, 14, an 18, not the United States Constitution, and thus *Zafiro* had no precedential weight in reviewing state court proceedings on due process grounds.) *Million,* at 393; see also *Perrou v. Jones* (E.D.Mich. 2009), No. 06–14941, 2009 WL 2392971.

The standard, as cited by the majority, is simply not the standard for establishing severance in Ohio courts. That standard, as set forth in *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 421 N.E.2d 1288, is as follows. "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges has the burden of affirmatively showing that his rights were prejudiced. *State v. Roberts* (1980), 62 Ohio St.2d 170, 175, 405, 405 N.E.2d 247, N.E.2d 247; * * *.; *see also State v. Hand*, 107 Ohio St.3d 378, 2006–Ohio–18, 840 N.E.2d 151; and *State v. McKnight*, 107 Ohio St.3d 101, 2005–Ohio–6046, 837 N.E.2d 315. He must demonstrate that the trial court abused its discretion in refusing to separate the charges for trial. *Opper v. United States* (1954), 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101; Wright, Federal Practice and Procedure 468, Section 227. More specifically, he has the burden of furnishing the trial

court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." Other courts have held that "error is prejudicial if there is a reasonable probability that the verdict might have been more favorable to the defendant if the error had not been made." *Rolle v. State* (Wyo. 2010), 2010 WY 100, 236 P.3d 259, citing *Vigil v. State* (Wyo. 2010), 2010 Wy 15, 224 P.3d 31.

For these reasons, I must dissent.

*Brenson I,* at 65-66

Petitioner asserts that the trial court's refusal to grant his motion for a severance contravened or unreasonably applied *Zafiro v. United States*, 506 U.S. 534, 539 (1993). *Supplemental Reply,* Doc. No. 38, PageID# 3854.  He argues that evidence indicating that police found Allen's DNA on a bloody glove inside of the house unfairly prejudiced him, causing the jury to convict him on the basis of cumulative evidence rather than just the evidence that directly implicated him in the crime.   Petitioner's *Supplemental Traverse*, Doc. No. 38, PageID# 3854-56.

A trial court's refusal to grant a request for a severance of trials generally constitutes a matter of state law. *See Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002); *Brinkley v. Houk,* 866 F.Supp.2d 747, 2011 WL 6029941, at *23 (N.D. Ohio Dec.5, 2011). Federal habeas corpus relief may be granted in connection with the claim only if Petitioner establishes that he was so prejudiced by error that he was denied a fundamentally fair trial in contravention of his right to due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Sutton v. Bell*, 683 F.Supp.2d 640 (E.D.Tenn. 2010) (citing *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007)). In this regard, Petitioner must

show more than potential prejudice; he must establish actual prejudice by reason of the joint trial, *see Dowell v. Eckman*, 2006 WL 228933, at *2 (W.D.Ky. Jan. 25, 2006) (citing *Opper v. United States*, 348 U.S. 84 (1954)), as alleged errors in the management of state criminal trials do not deny a defendant due process unless they are "so harmful to the cause of truth that ... they make the defendant's conviction fundamentally unfair." *Walters v. Sheets*, 2010 WL 7697542, at * 13 (quoting *Lewis v. Hutch*, 964 F.2d 670, 676 (7th Cir. 1992)). "Such prejudice may arise when there is a great disparity in the amount of evidence supporting the charges or when the jury is likely to confuse the evidence or infer a criminal disposition on the part of the defendant." *Payne v. Bobby*, No. 2:05–CV–050, 2006 WL 508784, at *9 (S.D. Ohio Feb.27, 2006) (citing *Webber v. Scott*, 390 F.3d 1169, 1177–78 (10th Cir. 2004)).

In *Zafiro v. United States*, 506 U.S. at 538 (1993), which addresses the issue in terms of the Federal Rules of Criminal Procedure, the United States Supreme Court held that relief is not warranted on a claim of improper joinder merely because the defendants present mutually antagonistic defenses. *See also Stanford v. Parker*, 266 F.3d 442, 458 (6th Cir. 2001) (same). The United States Court of Appeals for the Sixth Circuit has discussed the issue as it relates to Rule 14 of the Federal Rules of Criminal Procedure:

> For the sake of promoting efficiency and avoiding the potential for inconsistent verdicts, joint trials of defendants who are indicted together are actually encouraged rather than discouraged. *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); see also Fed . R.Crim.P. 8(b) (stating that "[t]wo or more defendants may be charged

> in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses"). This is especially true when two defendants are accused of participating in a conspiracy or joint scheme. *United States v. Weiner,* 988 F.2d 629, 634 (6th Cir.1992).

> ... Severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Walls,* 293 F.3d at 966 (quoting *Zafiro,* 506 U.S. at 539). A joint trial of co-defendants who present mutually antagonistic defenses is not prejudicial per se. *Zafiro,* 506 U.S. at 538. Moreover, a trial court's limiting instructions may "cure" such prejudice. *Id.* at 539.

*United States v. Cope*, 3312 F.3d 757, 780 (6th Cir. 2002).

The record fails to reflect that Petitioner and his co-defendant presented mutually antagonistic defenses or that, because of the joint trial, Petitioner was unable to cross-examine witnesses against him. The state appellate court concluded that the DNA evidence relating to Allen would have been admissible under Ohio law against Petitioner regardless of whether his trial was severed from that of the co-defendant, and this Court is bound by that ruling.  *See Leonard v. Warden, Ohio State Penitentiary,* No. 1:09-cv-056, 2014 WL 2207195, at *6 (S.D. Ohio May 28, 2014)(citing *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008)(quoting *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Maldonado v. Wilson*, 416 F.3d 470 (6th Cir. 2005); *Vroman v. Brigano,* 346 F.3d

598 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 735–36 (6th Cir. 1999); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986). The trial court properly instructed the jury on the law to be applied in consideration of the charges against Petitioner. The record fails to reflect that the jury disregarded those instructions, or that the issues in the case were so complex that the jury was unable to render a reliable verdict. The prosecution presented probative evidence of Petitioner's guilt, including Petitioner's fingerprints supporting the prosecution's contention that Petitioner was at the scene of the crime. In short, this Court is not persuaded that Petitioner has met his burden of establishing that the state appellate court's decision denying this claim was unreasonable so as to warrant federal habeas corpus relief.

Claim three is without merit.

## VI.  CLAIMS FOUR AND FIVE

In claim four, Petitioner asserts that his testimony to the grand jury was obtained and used against him in violation of his right to counsel. In claim five, Petitioner asserts that the prosecution "abused the grand jury process" by failing to advise him, prior to obtaining statements from him, that charges already had been filed against him. *Petition*, Doc. No. 2, PageID# 16-17.

The Supreme Court has addressed issues similar to the one Petitioner presents here. In *United States v. Mandujano*, 425 U.S. 564 (1976), a plurality decision, the Supreme Court reached the following conclusions:

> [o]ne opinion concluded only that the now familiar *Miranda* warnings need not be given to a grand jury witness subpoenaed to testify as to criminal activity in which he may have been involved. *United States v. Mandujano, supra*, at 571–584, 96 S.Ct. at 1773–1780 (opinion of Burger, C.J.). The second opinion concluded that on the particular facts of *Mandujano*, the defendant could be prosecuted for perjury consistent with the Fifth Amendment, but that absent "an intentional and intelligent waiver" of his "known" privilege against compulsory self-incrimination, the prosecution could not use a putative defendant's grand jury testimony against him at trial. *United States v. Mandujano, supra*, at 584–609, 96 S.Ct. at 1780–1792 (opinion of Brennan, J., concurring in the judgment).

*State v. Cook*, 469 N.E. 2d 577, 580 (1983).  In *Mandujano*, the defendant was subpoenaed to testify before the grand jury regarding the investigation of illegal drug sales in which he was involved.  Prior to questioning, the prosecutor advised him that he did not have to answer any questions that he thought might incriminate him.   In affirming Mandujano's convictions, the Supreme Court held in relevant part:

> [T]he witness, though possibly engaged in some criminal enterprise, can be required to answer before a grand jury, so long as there is no compulsion to answer questions that are self-incriminating; the witness can, of course, stand on the privilege, assured that its protection "is as broad as the mischief against which it seeks to guard." *Counselman v. Hitchcock*, 142 U.S., at 562, 12 S.Ct., at 198, 35 L.Ed., at 1114. The witness must invoke the privilege, however, as the "Constitution does not forbid the asking of criminative questions."  *United States v. Monia*, 317 U.S., at 433, 63 S.Ct., at 413, 87 L.Ed., at 383 (Frankfurter, J., dissenting).

> "The (Fifth) Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *Id.*, at 427, 63 S.Ct., at 411, 87 L.Ed., at 380.

Absent a claim of the privilege, the duty to give testimony remains absolute.

*Mandujano,* 425 U.S. at 574.

Similarly, in *United States v. Wong,* 431 U.S. 174, the defendant was subpoenaed to testify before the grand jury regarding illegal gambling activities.  Prior to testifying, she was given *Miranda-type* warnings, which she did not understand due to her limited understanding of English.  *Id.* at 176 n.2.  The Supreme Court nonetheless affirmed her conviction on perjury.

The Supreme Court also has rejected the argument that a petitioner has a constitutional right to a target letter informing him of his target status prior to testifying. *United States v. Myers,* 123 F.3d 350, 355 (6th Cir. 1997)(citing *United States v. Washington,* 431 U.S. 181, 189 (1977). *See also United States v. Gillespie,* 974 F.2d 796, 800 (7th Cir.1992) ("[The defendant] concedes—as he must—that target warnings are not constitutionally mandated.")(citing *Washington,* 431 U.S. at 189); *United States v. Goodwin,* 57 F.3d 815, 818 (9th Cir. 1995) (same); *United States v. Pacheco–Ortiz,* 889 F.2d 301, 307 (1st Cir. 1989) (same).

The Ohio Court of Appeals concluded that Petitioner's claim had no merit, as follows:

> On April 15, 2008 at 8:01 a.m., a complaint was filed in the Delaware Municipal Court charging James A. Brenson with the crime of aggravated murder with a repeat violent offender specification. The complaint specifically alleged that: "On or about June 12, 2000, James A. Brenson, Jr. did in conjunction with another person(s), purposely, and with prior calculation and design, cause the death of Norman E.

Herrell. Norman E. Herrell was bound and stabbed multiple times." [Joint Stipulations, Ex. A]. The complaint was sworn to by Sergeant Mark Leatherman. Also on April 15, 2008 at 8:01 a.m., a precipe for service was filed for the issuance of a warrant against James A. Brenson in the Delaware Municipal Court. Both Sergeant Mark Leatherman and Kyle Rohrer, Assistant Prosecuting Attorney signed the precipe. Joint Stipulations [Ex. B.]. On April 15, 2008 at 8:10 a.m., a warrant was issued by the Delaware Municipal Court. The warrant was signed by Judge David Gormley and ordered the arrest of James A. Brenson without unnecessary delay. The return on the warrant indicates that Sergeant Mark Leatherman received it on April 15, 2008 at 8:15 a.m. [Joint Stipulations, Ex. C].

The parties further stipulate that on April 15, 2008, commencing at approximately 9:12 a.m., Brenson appeared before the Delaware County Grand Jury and provided testimony. A copy of the transcript of Brenson's testimony has been provided to the trial court, in its entirety. State's Ex. 1. Brenson was neither served with the warrant, nor advised of the charges in the complaint prior to testifying before the Grand Jury on April 15, 2008.

It is firmly established that a defendant has the right to counsel, pursuant to the Sixth and Fourteenth Amendments, at or after the time that adversary judicial proceedings have been initiated against him, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Kirby v. Illinois* (1972), 406 U.S. 682, 689. The defendant is afforded this right to counsel regardless of whether he is in custody. *Brewer v. Williams* (1977), 430 U.S. 387. In the case at bar, the trial court determined that Brenson had the right to have the assistance of counsel when the formal complaint and arrest warrant were issued against him in this case.

The trial court noted that Brenson was not subpoenaed to appear before the grand jury; rather he appeared at the grand jury in response to a letter inviting him to testify.

The trial court further found that the grand jury transcript established that Brenson was given *Miranda* warnings at the outset of his questioning. Brenson "was advised by the prosecuting attorney that he had a right not to give testimony before the Grand Jury and that if he chose to testify he was waiving his right against self-incrimination. (Brenson Grand Jury Tr. 3, April 15, 2008.) Brenson was also advised that he had a right to consult with an attorney and that if he could not afford an attorney, the Court may appoint him one. Id. Brenson affirmatively waived his right to an attorney for the purpose of Grand Jury. Id. The prosecuting attorney also advised Brenson that anything discussed during the Grand Jury proceedings could be used against him "in a court of law some day." Id." [Judgment Entry Denying Defendant Brenson's Motion to Dismiss Indictment or Suppress Statements (Motion # 36), filed July 2, 2008 at 5]. [Hereinafter cited as "J.E. Motion # 36"]. Brenson affirmatively indicated that he understood this consequence of testifying before the Grand Jury. Id.

The question of an effective waiver of a Federal Constitutional right in a State criminal proceeding is governed by Federal standards. *Boykin v. Alabama* (1969), 395, U.S. 238. (Citing *Douglas v. Alabama* (1965) 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934). For a waiver to be valid under the Due Process clause of the United States Constitution, it must be: "[a]n intentional relinquishment or abandonment of a known right or privilege." *Boykin, supra*, 395 U.S. at 243 n. 5 (*Quoting Johnson v. Zerbst* (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461).


The Sixth Amendment guarantees to criminal defendants the right to counsel in post indictment interviews with law enforcement authorities. *Massiah v. United States* (1964), 377 U.S. 201, 205–07, 84 S.Ct. 1199, 12 L.Ed.2d 246. Unlike the right to counsel secured under the Fifth Amendment, the Sixth Amendment right to counsel comes into existence regardless of whether the defendant is in custody, so long as adverse judicial proceedings have been initiated against him. *See Patterson v. Illinois* (1988), 487 U.S. 285, 290, 298–99, 108 S.Ct. 2389, 101 L.Ed.2d 261.

Once a suspect against whom such proceedings have begun indicates his desire for the assistance of counsel, the authorities must cease interrogation, and any further questioning on the crime for which the defendant was indicted is forbidden unless counsel is present. *McNeil v. Wisconsin* (1991), 501 U.S. 171, 111 S.Ct. 2204, 2207–08, 115 L.Ed.2d 158 (1991). As clarified in *Patterson*, however, the initiation of adverse judicial proceedings does not erect an absolute bar to post indictment police interrogation in the absence of counsel; rather, a defendant may be questioned where he knowingly and intelligently waives his right to counsel, thus establishing " 'an intentional relinquishment or abandonment of a known right or privilege.'" *Patterson*, 487 U.S. at 292 (quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461.). In *Patterson*, the Supreme Court further held that advising a defendant of his right to counsel by means of *Miranda* warnings establishes that the ensuing waiver is knowing and intelligent, "As a general matter, ... an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." Id. at 296 (citation omitted).

The Supreme Court has declined to resolve explicitly the question of whether the Sixth Amendment requires a defendant to be informed, before questioning, that he or she has been indicted. *Patterson,* 487 U.S. at 295 n. 8. ("we do not address the question whether or not an accused must be told that he has been indicted before a post indictment Sixth Amendment waiver will be valid. Nor do we even pass on the desirability of so informing the accused—a matter that can be reasonably debated.")

In *United States v. Washington* (1977), 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 the United States Supreme Court ruled that where a grand jury witness was advised of and waived his right to remain silent, his incriminating testimony could be used against him in a later criminal prosecution, even though defendant was unaware that he was under suspicion. The Court stated, "Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant

warnings add nothing of value to protection of Fifth Amendment rights. 431 U.S. at 189, 97 S.Ct. 1819..." See also *United States v. Myers* (6th Cir. 1997), 123 F.3d 350; *United States v. Gillespie* (7th Cir. 1992), 974 F.2d 796, 800 ("[The defendant] concedes—as he must—that target warnings are not constitutionally mandated.") (citing *Washington,* 431 U.S. at 189, 97 S.Ct. at 1819); *United States v. Goodwin* (9th Cir. 1995), 57 F.3d 815, 818 (same); *United States v. Pacheco–Ortiz* (1st Cir.1 989), 889 F.2d 301, 307 (1st Cir. 1989) (same).

In *Moran v. Burbine* (1986) 475 U.S. 412,475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410, a case arising under the Fifth Amendment, the Court stated, "But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 316–317, 105 S.Ct. 1285, 1296–1297, 84 L.Ed.2d 222 (1985); *United States v. Washington,* 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977). Cf. *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *McMann v. Richardson,* 397 U.S. 759, 769, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970). Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. The Court of Appeals' conclusion to the contrary was in error." Id. at 422–423, 106 S.Ct. 1141. (Footnote omitted).

In the case at bar, the trial court found, "Brenson knew that any statement that he made could be used against him in subsequent criminal proceedings. Since Brenson knew what could be done with any statement he might make, and therefore, what benefit could be obtained by having the aid of counsel while making such statements, Brenson was essentially informed of the possible consequences of forgoing the aid of counsel. In fact, the transcript of Brenson's Grand Jury testimony reveals that Brenson had consulted with counsel prior to appearing before the Grand Jury. (Brenson Grand Jury Tr. 5.)." [J.E. Motion # 36 at 7].

Additionally, Brenson was aware of the nature of the charges and his suspected involvement in the offenses.

> Brenson had previously been indicted, arraigned, consulted counsel, and engaged in discovery prior to the dismissal of the previous indictment. Further, Brenson was not compelled to appear before the grand jury; rather he did so of his own free will.
>
> On three separate occasions, once before the grand jury in 2002, once in a police interview in 2003, and again before the grand jury in 2008, Brenson elected to waive representation and speak with the police or the prosecutor regarding his involvement in the murder of Norman Herrell. Because we believe that Brenson's waiver of his right to counsel was knowing, voluntary, and intelligent, we find no error in the trial court's decision not to suppress his statements.

*State v. Brenson,* 2010 WL 3784890, at *20-23.

Petitioner does not refer to, and this Court is unable to locate, any decisions of the United States Supreme Court on this issue.  That being the case, Petitioner cannot obtain relief on these claims.  *See* 28 U.S.C. § 2254(d).  For the reasons discussed by the state appellate court, and because the United States Supreme Court has not issued a decision on the precise issue(s) Petitioner raises, claims four and five lack merit.

## VII.   PROCEDURAL DEFAULT: CLAIMS SIX THROUGH ELEVEN AND THIRTEEN

In claim six, Petitioner asserts that he was denied his right to an impartial jury because the trial court refused to dismiss venire persons number 42 and 86 ("Sakich" and "Ames") as biased due to pre-trial publicity.  In claim seven, Petitioner asserts that the trial court abused its discretion and denied him a fair trial by refusing to grant Petitioner's requests for a mistrial.  In claim eight, Petitioner asserts that he was denied a fair trial by admission of testimony from Attorney Beal, Petitioner's prior attorney.  In claim nine, Petitioner asserts that the trial court improperly provided transcripts of

Petitioner's prior statements to the jury during deliberations.  In claim ten, Petitioner asserts he was denied a fair trial due to admission of prior bad acts.  In claim eleven, Petitioner asserts that he was denied effective assistance of trial counsel.  In claim thirteen Petitioner asserts that his convictions are against the manifest weight of the evidence.    It is the position of the Respondent that Petitioner has waived all of the foregoing claims for federal habeas corpus review.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state

procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

Petitioner properly raised claims six through eight on direct appeal; however, he failed thereafter to raise these claims on appeal to the Ohio Supreme Court, where he raised the following propositions of law:

> 1. When a defendant raises a claim of cumulative error, the defendant is not required to repeat the arguments as to why each individual error was prejudicial; instead, the defendant merely needs to explain that the errors worked together to further impact the verdict.

> 2. Crim.R. 14 does not require a criminal defendant to show "compelling, specific, and actual prejudice" in order to justify severing his trial from that of a co-defendant.

> 3. When the prosecution has already filed charges against a defendant and obtained an arrest warrant, the defendant

must be informed of the charges and warrant prior to agreeing to testify before a grand jury that is considering related charges.

4.   When a prosecutor dismisses an indictment against a defendant for purposes of further investigation, spends the next seven years investigating the defendant, then files the same charges against the same defendant in a new indictment, the time between the two indictments must be counted for purposes of determining whether the delay violated the defendant's Sixth Amendment right to a speedy trial.

5.   For purposes of assessing a due process speedy trial challenge, a defendant has demonstrated actual prejudice when the evidence at trial indicates that key defense witnesses were lost to death and disability as a result of a seven year delay in prosecution.

6.   Aggravated robbery. . . is an allied offense with aggravated robbery[.]

7.   Kidnapping under subdivision (A)(2) of R.C. 2905.01 is an allied offense with Kidnapping under subdivision (A)(3).

*Memorandum in Support of Jurisdiction*, Doc. No. 11-2, PageID# 864-65.

Petitioner nonetheless contends that he fairly presented claims six through eleven and thirteen to the Ohio Supreme Court by raising a claim of cumulative error as his first proposition of law.  That claim, according to Petitioner, necessarily included all of the errors alleged in the Ohio Court of Appeals.  By raising a claim of cumulative error and by referring to his state appellate brief, Petitioner contends, he thereby complied with the Ohio Supreme Court's rules on page limitations while preserving his claims for federal habeas corpus review.

This Court is not persuaded by this argument.  In his memorandum in support of the jurisdiction in the Ohio Supreme Court Petitioner briefly argued that the state appellate court had improperly denied his claim of cumulative error, and referred to the dissenting opinion in support of this argument.  PageID# 871.  He did not refer to any of the allegations he raises in habeas corpus claims six through eleven and thirteen, did not include them as propositions of law, and did not indicate in any manner in his memorandum in support of jurisdiction that he sought review of these claims by the Ohio Supreme Court.

Because Petitioner failed to raise claims six through eleven and thirteen in the Ohio Supreme Court, he now can no longer do so under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175(1967).

The Court must next decide whether the procedural rules at issue constitute adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. Under this analysis, the procedural rules barring petitioner's claims for relief constitute adequate and independent state grounds for denying relief. The requirement that all available claims be asserted in the first appellate proceeding serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is

stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra*; *State v. Ishmail, supra*; *State v. Perry, supra*.

The Court concludes that petitioner has waived his right to present claims six through eleven and thirteen for federal habeas corpus review. Petitioner can still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. He has failed to do so here.  The only cause for the procedural default would appear to be a claim of petitioner's claim of ineffective assistance of trial counsel. Petitioner never raised this claim in the state courts.  He thereby has also waived this claim for review, and cannot establish cause for his default.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52, (2000) (an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim cannot itself be procedurally defaulted).

Beyond the four-part *Maupin* analysis, this court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333 (1992). "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623.

Petitioner asserts that he is the victim of a manifest miscarriage of justice such that this Court may address the merits of claims Petitioner otherwise has procedurally

defaulted.  *Supplemental Traverse*, Doc. No. 38, PageID# 3912-13.  Petitioner states he has always protested his innocence of the crimes charged.  He argues, essentially, that the evidence is insufficient to support his convictions.  PageID# 3913-14.

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317, 115 S.Ct. 851. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327, 115 S.Ct. 851. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id*. at 321, 115 S.Ct. 851.

*Souter v. Jones,* 395 F.3d 577, 589-90 (6th Cir. 2005).

The record fails to reflect that Petitioner is the victim of a manifest miscarriage of justice.  The state court of appeals recited evidence of petitioner's guilt, which was apparently enough to persuade a jury beyond a reasonable doubt that he was guilty,

and he has offered no proof of innocence.  Denial of guilt is hardly an extraordinary event in a criminal case, and that bare denial is not enough to satisfy the exacting inquiry which is needed to excuse a procedural default. *Cf. Schlup v. Delo*, 513 U.S. 298, 324 (1995) (a finding of actual innocence requires the petitioner to present evidence which undermines the Court's confidence in the jury's finding of guilt). There is no such evidence here.

## VIII.  CLAIM TWELVE

In claim twelve, Petitioner asserts that he was denied a fair trial based on cumulative error.  *Petition*, Doc. No. 2, PageID# 33.  This claim fails to present an issue appropriate for federal habeas corpus relief. "[T]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006)(quoting *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).

> To justify a grant of habeas relief, a federal court must find a violation of law that has been clearly established by the holdings of the United States Supreme Court decisions at the time of the relevant state-court decision. *King v. Bobby*, 433 F.3d 483, 490 (6th Cir. 2006). Cumulative error" cannot form the basis of habeas relief under § 2254.

*Madyun v. Jackson*, 2007 WL 2651997 (E.D. Mich. Sept. 7, 2007)(citing *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Lorraine v. Coyle*, 291 F.3d at 447)).

Claim twelve is without merit.

## IX. RECOMMENDED DISPOSITION

For the reasons set forth above, the Magistrate Judge **RECOMMENDS** that Petitioner's request to strike Respondent's *Supplemental Return of Writ* be **DENIED** and that the habeas corpus petition be **DISMISSED.**

## X. PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp
United States Magistrate Judge